Emma J. Reynolds *et al.*

*v.*

Mary A. Adams.

</div>

1. Will—*evidence proper on question of undue influence.* On the contest of a will and codicil when offered for probate, on the ground of want of mental capacity and of undue influence by a second wife, it is error to exclude evidence of

matters occurring in the testator's family within a year preceding the making of the will, which affords an insight into the private history of the family, and furnishes an understanding of the relations of the testator with his wife, to whom the principal part of the estate was devised, and which also tends to show the means employed by the wife to alienate the affections of the testator from his children by a former wife, and to obtain the control of his property.

2. SAME—*declarations of testator.* While the declarations of a testator are not admissible to show an express revocation of his will, or the fact it was executed under duress, or to prove undue influence, they may, nevertheless, be proved and used to show his mental condition at the time of the execution of the will, or so near the time that the same state of affairs must have still existed.

3. Where the probate of a will is resisted, on the ground of a want of mental capacity in, the testator and undue influence exercised by his wife, to whom the bulk of his property is given, any evidence is proper which tends to show the testator's mental condition, the annoyances he was subjected to by the continued importunities of his wife, his susceptibility to the influences of those in whose care he was, and his helplessness in their hands, from want of mental vigor induced by long sickness, to resist any influences that might be brought to bear on him.

4. EVIDENCE—*how construed on question of admissibility.* On the question of the admissibility of evidence, it must be regarded as true and proving all that it tends to prove.

APPEAL from the Circuit Court of Knox county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. WILLIAMS, MCKENZIE & CALKINS, for the appellants:

If the evidence excluded did not show that the testator, at the time of the making of the supposed will and codicil, was not able to make a disposition of his property with understanding and reason, it certainly furnished clear evidence of the fact that his mental faculties were so much weakened by his advanced years and a disease of the head which had affected him for years, as to make him an easy dupe to the arts and intrigues of the designing woman in whom he had reposed his confidence, and by the abuse of which we unhesitatingly say she embittered his life, disinherited his children, and unlawfully enriched herself; and it is not a sufficient answer to say,

that because he was capable of understanding questions put to him, and gave rational answers, he was of sound mind and capable, for the rule of law and common sense is otherwise. The competency of the mind must be judged of by the nature of the act done, and from a consideration of *all* the circumstances surrounding the case. *Blewith* v. *Blewith,* 4 Hagg. 419.

It is only by such evidence that the court or jury could be informed of the mental capacity of the testator, and a wide range of inquiry has always been allowed and sanctioned. *Waterman* v. *Whitney,* 11 N. Y. 137; *Rambler* v. *Tryon,* 7 S. & R. 90; *Lightner* v. *Wike,* 4 id. 203; *Hughes* v. *Hughes,* 17 Ala. 519; *Dodge* v. *Meech,* 1 Hagg. 612.

In all cases of alleged undue influence, the mental strength and capacity of the testator are directly in issue. *Waterman* v. *Whitney, supra.*

The main question relied on by appellants to set aside the will in controversy, was that of undue influence, and from its very nature the evidence must, of necessity, not be limited to a narrow field. Everything that tended to reveal the character of the testator, his feelings, thoughts and passions, hates and affections, his strength and weakness, the influences that were thrown around him, and his change of intention, would have aided in its solution. They *were all questions of fact.*

The declarations of the testator, before and after the execution of the will and codicil, giving the reasons why he had such a bitter feeling towards his children during the last years of his life, and his declarations at different periods of his life, both in writing and parol, as to his views and intentions in the disposition of his property, were all competent testimony to explain and harmonize, if possible, the inconsistencies of his acts. This became the all-important fact.

And especially was it competent evidence when the fact did appear, that at the time the will was written the testator was sick and unable to leave the house, and an attorney was sent for by appellee, or at her solicitation, and who went to

the house, and in the absence and without the knowledge of any member of that family, save the one benefited (appellee), the will was made, and it nowhere appears that the testator dictated the will or knew of its contents, except by the evidence of the attorney who drew it. The codicil was procured in substantially the same manner, but with the additional fact that at about that time the testator was in a very feeble state, and seemed to be under the influence of liquor.

Where a will is written, or procured to be written, by a person benefited by it, these are circumstances to excite stricter scrutiny, and require stricter proof of volition and capacity. *Duffield* v. *Robeson*, 3 Harring. 384; *Tompkins* v. *Tompkins*, 1 Bailey, 92.

Where a codicil was made disposing of the property of the testator in a manner irreconcilable with his character and previous intentions, and at a variance with the former testamentary disposition, and it appeared that all the friends and family were absent, and only those present who were benefited under or engaged in the preparation of the will, these facts were held to vacate the instrument. *Brydges* v. *King*, 1 Hagg. 250.

In this case the testator substantially ignored his children, and who can say it was the free and deliberate act of a self-poised and clearly-disposing mind? It is true that the subscribing witnesses were called to attest to the due execution of the will and codicil, but they did not, nor could they, swear to the antecedent agencies by which that will and codicil were procured. That evidence is wanting in this cause, and the will should be set aside. *Harrell* v. *Harrell*, 1 Duv. (Ky.) 203; *Cramer* v. *Crambaugh*, 3 Md. 431.

It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. The purposes to be served are of the nature that court privacy, and in some cases the courts have held that fraud and undue influence will be inferred from the nature of the transaction alone. *Tyler* v. *Gardiner*, 35 N. Y. 595; 2 Seld. 272.

The codicil was drawn up at the house, and the former will revoked to the extent above shown, and the fact appearing in the third item of the codicil, that "I further request that my wife leave to the missionary cause one-half as much property as she receives of me," indicates one more of the methods that appellee used to mislead the old man, and compel him to revoke the gifts to his children, withdraw the charitable bequest from the church in which he had been raised and nurtured, on the plea made by appellee that she was the proper filtering machine through which the generous impulses of the testator should be made known and exhibited.

If the provisions of a will executed by a feeble old man differ from his previously expressed intention, and differ in favor of those who stood in confidential relations to him, it is evidence of fraud and undue influence, which must be overcome by the most satisfactory proof. *Lee* v. *Dill*, 11 Abb. (N. Y.) Pr. 214; *Boyd* v. *Boyd*, 66 Pa. St. 283; *Walker* v. *Hunter*, 17 Ga. 364; *Small* v. *Small*, 4 Me. 192.

We insist that any statement of the testator in relation to the change of his intention, or the causes that led to that change by which he disinherited his children, and connected with the transaction, is original and competent testimony. It was so held in *Pratt* v. *Coffman*, 3 Mo., where the court announce the rule to be, that "inquiry into the testator's condition," his declarations, though made some time prior to the execution of the will, are clearly admissible. The harmony of the will with the testator's disposition, and his declarations in regard to it, are facts to be considered. *Allen* v. *Public Admr.* 1 Bradf. 378; *Wier* v. *Fitzgerauld*, 2 id. 42.

And as was said by the court in *Waterman* v. *Whitney*, cited *supra*, the mental strength and condition of the testator are directly in issue in *every* case of undue influence.

"A change of intention is of importance where the claim is of unsound mind, and is a circumstance that may be deduced to aid the inquiry. That such evidence is admissible is asserted by the authorities almost without number." *Hester* v.

*Lynch,* 1 Yeates, 108; *Starrett* v. *Douglas,* 2 id. 46; *Morris* v. *Sheppard,* 8 Harris, 475.

Previous conduct and declarations of the testator are always admissible. *Shailer* v. *Bumstead,* 99 Mass. 122, 124; *McTaggart* v. *Thompson,* 14 Pa. St. 149.

The question to be determined was as to the testator's capacity to make a will, and the condition from which that capacity is to be deduced is one of fact, to be shown by evidence. *Kempsey* v. *McGinnis,* 27 Mich. 363; *Paramore* v. *Taylor,* 11 Gratt. (Vt.) 220; *Florey* v. *Florey,* 24 Ala. 241; *Gaither* v. *Gaither,* 20 Ga. 709; *Duffield* v. *Harris,* 2 Harr. (Del.) 375.

Threats of personal estrangement and non-intercourse, to influence a testamentary disposition of property, constitute undue influence. *Moore* v. *Blanvelt,* 15 N. J. Eq. 2 McCart. 367.

The inquiry whether undue influence was exerted over the mind of the testator, should not be confined to the execution of the will. It should be whether any undue influence operated on him in the disposition of his property. *Taylor* v. *Wilbaum,* 20 Mo. 306; *White* v. *Bailey,* 10 Mich. 155; *Beauben* v. *Cicatte,* 12 id. 486; *Willitts* v. *Porter,* 42 Ind. 250; *Roberts* v. *Trawick,* 17 Ala. 455.

Declarations of the testator, before and at the time of the making of the will, are admissible to show fraud and undue influence in obtaining the will. *Smith* v. *Tenner,* 1 Gall. 170; *Lucas* v. *Parsons,* 27 Ga 593; *Jackson* v. *Jackson,* 32 id. 325.

This court has decided, that "where the whole evidence is excluded from the jury by the court, it is in effect an instruction to the jury as in case of non-suit—a practice that has no sanction in this State." *Crowley* v. *Crowley,* 80 Ill. 473; *Smith* v. *Gillett,* 50 id. 301; *Merricks* v. *Davis,* 65 id. 319.

The opinion in the contested will case of *Meeker* v. *Meeker,* as reported in 75 Ill. 263, seems to support the theory that this evidence was admissible, as in that case the court say, "there were forty or fifty witnesses examined on each side."

Mr. L. DOUGLASS, for the appellee:

The will being properly proven, and the proof ample, and there being no proof of unsoundness of mind, the only remaining questions that can arise on the evidence, and the only ones insisted upon in this case, are, was the will obtained by undue influence; and it may be well in the outset to show what the law on this point is by the decisions in this State.

The party alleging undue influence must prove it. *Roe et al.* v. *Taylor*, 45 Ill. 492. The influence exerted must be of such a character as to deprive the testator of his free agency; that neither advice, argument nor persuasion will vitiate a will made freely, and from conviction, though such will would not have been but for such advice and persuasion; that it must be an influence specially directed towards the object of procuring a will in favor of particular parties, etc. *Roe et al.* v. *Taylor*, 45 Ill. 491.

The fraud or undue influence to avoid a will must be directly connected with its execution. That though the testator acted under advice in the ordinary affairs of life, and was influenced by it, such relations and influence would not tend to prove that undue influence was used in procuring the execution of a will. *Brownfield* v. *Brownfield*, 43 Ill. 152; *Rutherford* v. *Morris*, 77 id. 412.

This court has said, that a wife, who was the principal devisee in the will of her husband, might lawfully exercise the natural and proper influence of her position to induce the testator to make a will appointing her executrix, giving her what the law allows, and preferring her children over those by a former wife. *Carmichael* v. *Reed*, 45 Ill. 108; *Rutherford* v. *Morris*, 77 id. 412.

This influence to avoid a will must be one still operating at the time the will is made, and producing that perversion of mind which made the will.

It is said a will is set aside in such cases, on the ground it is not an honest will—that it does not reflect the unbiased intent or wishes of the testator, but, on the contrary, had been

extorted or procured from the deceased in the weakness or imbecility of old age or disease, or by artifice, deceit or imposition, or by persistent importunity, amounting to a species of coercion or moral duress, undue influence, in this sense, being a fraud, and for the fraud it is not the act, deed or will of the deceased. Upon no other ground has the court a right to set aside a deed or will executed by a person of sane mind or memory, when the execution of the same was not procured, and the free agency of the party overcome, by some constructive coercion, duress or fraud.

Influence and persuasion may be fairly used, and a will procured by honest means, by acts of kindness, attention and importunate persuasion, which delicate minds would shrink from, and would not be set aside on that ground alone. Influence, to vitiate an act, must not be the influence of affection or attachment, it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act. Advice, persuasion or entreaty does not constitute undue influence, nor will love, affection and gratitude afford ground from which undue influence may be inferred. *Rutherford* v. *Morris, supra,* and cases, cited.

Children have no legal claim to the property of living parents; that all parents have the right to judge who are the proper objects of their bounty, and, if free from some insane delusion or senile dementia, may give their property to aliens to their blood. *Rutherford* v. *Morris, supra; Uhlich* v. *Muhlke,* 61 Ill. 499; *Heuser* v. *Harris,* 42 id. 425; *Clearwater* v. *Kimler,* 43 id. 272.

No declaration of the testator, made before or after the making of the will, can be received to defeat the will. *Dickie et al.* v. *Carter,* 42 Ill. 388.

The court ruled out from the consideration of the jury all the evidence of Lucinda Hocket and Nancy Hocket, as to all matters occurring between July and October, 1873, because it was too remote from the execution of the will in April, 1875.

1st. This evidence was properly ruled out for the reason stated, it being too remote and not connected with the execution of the will.   2d. Because it was immaterial, and reflected no light on the question at issue: that of fraud or undue influence.

The exclusion of this evidence was authorized on two grounds: 1st. For the reason it did not tend to prove the issue.   2d. For the reason that the verdict would not have been different if it had not been excluded.   *Crowly* v. *Crowly,* 80 Ill. 473; *Union Nat. Bank* v. *Baldenwick,* 45 id. 375.

Where justice has been done, the court will not reverse for error, if the finding is right.   *Charter* v. *Graham,* 56 Ill. 19; *Stodie* v. *Dills,* 62 id. 432; *Lettick* v. *Honnold,* 63 id. 335; *Hardy* v. *Keeler,* 56 id. 152; *Toledo, Peoria and Warsaw Ry. Co.* v. *Ingraham,* 58 id. 120; *Graves* v. *Shoefelt,* 60 id. 462; *Chicago, Burlington and Quincy R. R. Co.* v. *Dickson,* 63 id. 151; *Daily* v. *Daily,* 64 id. 329.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

There was exhibited in the county court of Knox county an instrument in writing with a codicil attached, purporting to be the last will and testament of James A. Bundy, deceased. From the order admitting the same to probate the heirs of the testator prosecuted an appeal to the circuit court of that county, under that clause of the 4th section of the act in relation to "Wills" which provides that appeals may be taken from the order of a county court allowing or disallowing any will to probate, to the circuit court of the same county, by any person interested in such will, and the trial of such appeal shall be *de novo.*

On the trial of the appeal in the circuit court proponent proved by the subscribing witnesses the execution of the will and codicil, that they were witnessed with the usual formalities, and the testator, at the time of the execution of both instruments, was of sound mind and memory, and rested her case. The defense sought to be made by contestants was twofold:

First, the want of capacity in the testator to make a will, and second, undue influence exercised by proponent over the testator to induce him to make both the will and the codicil. The case seems to have been submitted to a jury without argument or instructions from the court, who found the "will in controversy was the will of James A. Bundy," but there was no finding as to the codicil. Upon receiving the verdict the court ordered and adjudged that "said will is duly proven as the will of James A. Bundy, deceased, together with the codicil thereto annexed, and that the same be admitted to probate and record," and rendered judgment against contestants for costs.

A short history of the case may assist to a clearer understanding of the legal propositions discussed. The testator was twice married. By his first wife he had a number of children, with whom he always maintained the most affectionate relations until after his second marriage. In 1870, the testator, then a widower of the age of sixty-eight years, being in feeble health, undertook a journey to California. On account of the condition of his health, his daughter, Mrs. Gordon, accompanied him to secure for him that care which his physical condition required. His daughter remained with him about a month and then returned to her home. On his way out, the testator made the acquaintance of a lady on the train of whom he had never heard before, and whom he married within a month after his arrival in California. After their marriage the testator and his wife returned to his former residence in this State, where they resided until his death, which occurred July 25, 1875. The health of the testator never materially improved after his second marriage. Much of the time he was confined to his room, was constantly under the care of a physician, and steadily grew worse until his death. He had no children by his last wife.

On the 17th day of April, 1874, he made and published his will, by which he bequeathed to the Methodist Episcopal Church $1000, to be applied to the support of a mission in China; also

$500 to the Methodist Episcopal Church in Galesburg; also to Carrie Gordon, an adopted daughter of his son-in-law, the sum of $1000; also to his grandson James Grant Bundy, $1000; also to each child of his daughter Martha, $5; also to his grandson Albert West, $5; also to his daughter Angeline Gordon, $5; also to his son, Milton Bundy, $5; and all the residue of his estate, real and personal, he devised and bequeathed to his wife, Mary A. Bundy, since intermarried with Mr. Adams, and it is in the latter name she now defends. The proponent was herself named as sole executrix of the will, and relieved of the statutory duty of giving bond as such executrix. This will was witnessed by Leander Douglass and William W. Porter.

On the third day of April, 1875, the testator made and published a codicil to his will, by which he revoked the following bequests therein made: first, the bequests to the Methodist Episcopal Church; second, the bequest to Carrie Gordon, and third, the bequest to James Grant Bundy, and republished the will as changed. The codicil was witnessed by Leander Douglass and John W. Boyd, with the usual formalities.

By the provisions of his will all the children of the testator were cut off from any participation in his estate with five dollars each, while the major portion of his property, which was quite considerable, was given to his wife, whom he had recently married, in his old, age after a brief acquaintance. It will be noticed the bequests in the will, above mere nominal sums, were all revoked by the codicil, so that proponent became the sole legatee of the entire estate to the absolute exclusion of all his children and grand-children. Prior to the second marriage of the testator he had always lived on the best of terms with his children, but after that event, both before and after the making of his will, he entertained the bitterest hatred to most if not all of them. It does not appear that the testator ever recovered his health after his journey to California. His head was much affected. One of the physicians who attended

the testator describes his mental and physical condition a short time before the making of the will.   He saw him in July, 1873, and says "he was then in very poor health, very feeble,—he was not himself; his condition was such as to render him more susceptible of being influenced by those around him ; he was constantly racked with pain; he was dependent as a child."

On being recalled, he says the testator "was then under the control and influence of his wife as much as an infant two hours old ever was under the control of a nurse and mother,— as helpless and dependent upon her for everything—a drink of water or any little attention that he needed; he was perfectly under her control; he could not help himself." It is certain the testator did not have that vigor of will which he possessed prior to his sickness, but whether his wife obtained that control over him attributed to her, and whether she exercised it for improper purposes, are of course questions of fact to be found from the testimony.

On both grounds on which the will was contested there was evidence offered. As to the mental capacity of the testator, the testimony of both professional and non-professional witnesses was taken, but as another hearing of the cause is to be had on account of the rulings of the court in rejecting proper testimony, a majority of the court are of opinion it is not proper at this time to remark upon what it may be thought to prove or tend to prove. On the question made, as to the undue influence it is alleged the party proponent exercised over the testator to induce the making of the will and codicil, and for which purpose alone it seems to have been offered, the evidence consists largely of the acts of the parties and the declarations of the testator made both before and after making the will.   Much of the latter class of testimony was excluded from the consideration of the jury after it was given.

On motion of proponent the court ruled out from the consideration of the jury all the testimony of the witnesses Hocket, in relation to matters occurring in the family of the testator between July and October, 1873.   The testimony excluded,

in some respects was all important, as it afforded an insight, not otherwise obtained, into the private history of the family, and furnished a clearer understanding of the relations of proponent and the testator at any time near the date of the will, than any other evidence in the record. It tends to show what means contestants insist were employed by proponent to alienate the affections of her husband from his children by a former wife, and to obtain the control of his property. According to the testimony of one of the witnesses, if it can be believed, she compelled him to forbid his children visiting his house, and at one time when his son-in-law and his daughter called, she became very angry, and carried on so because he would allow them to visit him, that he told her if she would say no more about it for a certain length of time—two weeks—he would give her $1000, but the witness adds "she did not stop."

The testimony excluded further tends to show she constantly importuned him to deed his property to her, and he would try to quiet her by assuring her he would make provision for her in his will, which the sequel shows he did. One reason, it is said, she constantly urged why the property should be deeded to her, was, that she might hold it "in case the will was broken." Many other facts of the same nature, tending to show the relations that existed between the parties, were disclosed, but those stated are sufficient to show the character and importance of the testimony excluded, if it was true, and for the purposes of this decision it must be regarded as true and as proving all it tends to prove.

The reason assigned by the court for excluding this testimony is, that "it was too remote the time of the execution of the will." But the decision can hardly be supported for that reason, as the contestants offered to prove declarations of the testator near the time, both before and after the execution of the will, to show that the same state of affairs must have still continued to exist, but were denied the privilege. The argument now advanced in support of the decision of the court is, that the declarations of the testator, neither before nor after

the execution of the will, are admissible in evidence to defeat the will.   As authority for the position assumed, the case of *Dickie* v. *Carter*, 42 Ill. 376, is cited.   That case simply expresses the well understood doctrine that a testator can not revoke or ·otherwise invalidate his will by parol declarations made previously or subsequently to its execution.   That principle is nowhere questioned.   A will once executed with the usual formalities prescribed by the statute, and valid, can only be set aside by a revocation, in writing, of the same grade, witnessed with the same formalities, or by destruction, as by burning or tearing it up, when deliberately done.   The rule deducible from the cases on this subject is, that while the declarations of a testator are not admissible to show an express revocation of his will, or the fact it was executed under duress or from undue influence, they may nevertheless be proved and used to show his mental condition at the time of the execution of the will, or so near the time the same state of affairs must have existed.   That is the principle on which the jury ought to have been permitted to consider the testimony excluded by the decision of the court.   It tended to show his mental condition, the annoyances he was subjected to by the continual importunities of his wife, his susceptibility to the influence of those in whose care he was, and his helplessness in their hands, from want of mental vigor induced by long sickness, to resist any influences that might be brought to bear on him.   On reference it will be seen this is the doctrine of the cases cited in *Dickie* v. *Carter*, in support of the views expressed, so far as they discuss this subject.

In the later case of *Waterman* v. *Whitney*, 1 Kernan, 157, the court remark upon the case *Jackson* v. *Kniffer*, 2 Johns. 31, one of the cases cited in *Dickie* v. *Carter*, and treat it as not inconsistent with the principle that declarations of a testator, made either before or after the execution of the will, are admissible in evidence to show the mental capacity of the testator, and this case was decided long before the decision in *Dickie* v. *Carter* was announced.   In citing *Jackson* v. *Kniffer*,

in *Dickie* v. *Carter*, it must be presumed this court understood the case as it was understood by the court that pronounced it.

In *Waterman* v. *Whitney*, Mr. Justice SELDEN very justly remarked, that "much of the difficulty, however, had arisen from the omission to distinguish with sufficient clearness between the different objects for which the declarations of the testator may be offered in evidence in cases involving the validity of their wills." He then proceeds to discuss the rules by which the admissibility of evidence in such cases is goverened, as they naturally arrange themselves in the following classification: 1st, to show a revocation of a will admitted to have been once valid. 2d, to impeach the validity of a will for duress, or on account of some fraud or imposition practiced upon the testator or for some other cause not involving his mental condition, and 3d, to show the mental capacity of the testator, or that the will was procured by undue influence.

After a careful review of the authorities, the conclusion was reached, that the numerous cases in which the declarations of testators have been held inadmissible upon contests respecting the validity of their wills, apply to one or the other of the first two of the three classes into which the subject was divided, and that none of them have any application to cases in which the will ·is assailed on account of the insanity or mental capacity of the testator at the time the will was executed, or on the ground the will was procured by undue influence. Such prior and subsequent declarations of·testators in such cases are held to be competent evidence only as to the mental capacity of the testator.

Another case cited in *Dickie* v. *Carter* is *Comstock* v. *Hadlyne*, 8 Conn. 254, erroneously cited as being in 8 Cowen, 263, where it was declared the declarations of a testator, in a contest involving the validity of his will, are admissible to show the testator's state of mind, but not to prove the facts stated. The distinction between the proofs of alleged facts and of the mental condition of the testator whose will is assailed on account of mental infirmities, is not discussed in

*Stevens* v. *Vanclear,* 4 Wash. C. C. R. 262, another case cited in *Dickie* v. *Carter.*

In *Shailer* v. *Bumstead,* 99 Mass. 112, it was said by the court, in discussing this subject: "As before stated, the previous conduct and declarations are admissible, and so, by the weight of authority and upon principle, are subsequent declarations when they denote the mental fact to be proved."

In *McTaggart* v. *Thompson,* 14 Pa. St. R. 149, it was distinctly ruled that declarations of a testator, though made after the execution of the will, are admissible in such cases as evidence of imbecility of mind. Many other cases to the same effect might be cited, but it is believed these are sufficient to show that the principle we are endeavoring to maintain has the support of well considered cases in other courts of the highest authority.

But aside from all authority, on principle, declarations of a testator, in a contest involving the validity of his will, as respects his mental condition at the time of its execution, are and ought to be admissible. Often such declarations may be most satisfactory evidence, and afford a clearer understanding of the testamentary capacity of the testator than any other evidence that could be produced. Naturally, the mind sympathizes with the body in that which debilitates, and such testimony may show a mind weary beyond further endurance by long continued ill-health and incessant and vexatious importunities, and willing to purchase rest and quiet at any price. More than that, it may be proof of that condition of mind readily susceptible of impressions from any source. Nothing is more certain than that the enfeebled and weary mind is, in that condition, most susceptible to any influence calculated to annoy and harrass. It is a proposition that needs no argument in its support, that the feebler the mind, no matter from what cause—from sickness or otherwise—the less evidence will be required to invalidate the will of such a person on the ground of undue influence.

Whether the testimony excluded was true or untrue we

express no opinion. It was error to exclude it, and for that reason the order admitting the will and codicil to probate will be reversed, and the cause remanded.

*Judgment reversed.*