NANCY M. HURLEY *et al.* Appellees, *vs.* SAMUEL W. CALD-
WELL *et al.* Appellants.

*Opinion filed April 21, 1910.*

1. WILLS—*verdict in a will case has same force as verdict at
law.* The verdict of the jury in a contested will case, under the
statute, has the same force and effect as a verdict in a case at law
under a like state of facts, and if the verdict is not manifestly
against the weight of the evidence the court is bound by it in the
same manner and to the same extent as in a case at law.

2. SAME—*person not capable of transacting any kind of busi-
ness lacks testamentary capacity.* A person may not be capable
of transacting "ordinary business" and yet have testamentary ca-
pacity, but if he is mentally incapable of transacting any kind of
business whatever he is lacking in testamentary capacity.

3. SAME—*when declarations of testator inconsistent with will
are admissible.* Declarations of the testator with reference to a
disposition of his property contrary to the provisions of the will
are admissible upon the subject of testamentary capacity, provided
there is other proof of lack of testamentary capacity, otherwise
they are not admissible.

APPEAL from the Circuit Court of Morgan county; the
Hon. OWEN P. THOMPSON, Judge, presiding.

BELLATTI, BARNES & BELLATTI, for appellants.

WORTHINGTON & REEVE, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is a bill filed by the appellees, Nancy M. Hurley,
Eliza S. Willson and Effie M. Kamm, in the circuit court
of Morgan county, to set aside the last will and testament
of their father, Robert L. Caldwell, on the ground of tes-
tamentary incapacity and the exercise of undue influence.
The complainants in the bill are the daughters of the de-
ceased and the defendants are his six sons. Issues were
joined and a trial had before a jury, resulting in a verdict
that the paper offered in evidence was not the last will and

testament of Robert L. Caldwell. Motion for a new trial was overruled and a decree entered setting aside the will and the probate thereof. Three of the defendants, Samuel, James and Lewis Caldwell, have perfected an appeal to this court.

Robert L. Caldwell, who for a number of years had been a resident of Morgan county, died June 22, 1908, leaving surviving him his nine children, viz., Nancy M. Hurley, Eliza S. Willson, Effie M. Kamm, and Samuel W., James H., Edwin G., George A., Lewis W. and Charles R. Caldwell, as his only heirs-at-law. His wife had died some years previously. The record does not disclose his age, but it is apparent that he was quite an old man. His property at the time of his death was valued at something over $30,000, consisting of real estate of the value of between $20,000 and $21,000, and notes, cash in bank and some chattel property. He was a farmer and resided upon his farm at the time of his death. He had been the father of twelve children, three of them dying prior to the time of his death. Of these Mrs. Hurley was the oldest. She resided with her parents until she was about forty years of age, assisting her mother in her general household duties and in the rearing of the younger children and also assisting her father in the conduct of his farming operations, it appearing that she had frequently worked with him in the fields and. assisted in performing the various tasks to be performed in connection with the operation of a farm. She is the only one of the children who remained with their parents any considerable time after having arrived at the age of majority. All of the other children left home upon becoming of age, or soon thereafter, and engaged in business for themselves. Mrs. Caldwell was an invalid during the last five or six years of her life, and the conduct of the household affairs and the rearing of and caring for the younger children of the family devolved entirely upon Mrs. Hurley during that time. On June 18, four days

prior to his death, Robert L. Caldwell executed the will in controversy, in and by which he gave and devised to his two daughters, Mrs. Willson and Mrs. Kamm, $1000 each, and to James H. Caldwell, his son, as trustee, in trust for Mrs. Hurley, either the sum of $1200 or a certain residence property in the city of Jacksonville, as Mrs. Hurley should elect. In the event that she should elect to take the $1200 she was to receive the net income therefrom during her lifetime, and in the event that she should select the residence property in the city of Jacksonville she was to receive the net rents and profits therefrom during her lifetime. At her death the property therein devised for her benefit, whether it be the residence property or the $1200 in cash, as she should elect, was to be divided equally between Mrs. Willson and Mrs. Kamm. All the residue of his property he devised to his six sons, in equal parts. Three of the sons,—Samuel W., James H. and Lewis W.,— were named as the executors of the will.

On the trial of the cause no proof was offered to support the allegation of undue influence and that issue was withdrawn from the consideration of the jury, and the only question presented to them for determination was whether, at the time of the execution of the alleged will, Robert L. Caldwell possessed sufficient testamentary capacity to make such last will and testament. Evidence was offered on the question of the mental condition of Caldwell at the time the alleged will was executed, both on the part of the contestants and the proponents of the will. This evidence was conflicting. Six of the witnesses for contestants, including three of the sons, testified that at the time of the execution of the alleged will Robert L. Caldwell did not have the mental capacity to transact any kind of business. One, a witness to the will, testified that he was of unsound mind, and two others testified that at that time he did not have the mental capacity to transact ordinary business. On the other hand, a number of the witnesses for proponents

testified that the deceased was at that time of sound mind and capable of transacting ordinary business. Not all of the witnesses for either party were asked to express an opinion as to the mental condition of Robert L. Caldwell at the time of the execution of the alleged will. One witness for appellants declined, on his direct examination, to express any opinion on that question.

The reasons urged here for reversal are based almost wholly upon the contention that the verdict and decree are contrary to the weight of the evidence, and that a great preponderance of the evidence is to the effect that Robert L. Caldwell was of sound and disposing mind and memory at the time he executed the alleged will. In contested will cases arising under our statute, the verdict of a jury is to have the same force and effect as is given to a verdict in a case at law under a like state of facts, and when the verdict in such case is not manifestly against the weight of the evidence the court is bound by it in the same manner and to the same extent as if it were a case at law. *Calvert* v. *Carpenter,* 96 Ill. 63; *Moyer* v. *Swygart,* 125 id. 262; *Hill* v. *Bahrns,* 158 id. 314; *Smith* v. *Henline,* 174 id. 184.

From an examination of the record it does not appear that the decree is against the weight and preponderance of the evidence. It appears from the testimony offered on the part of the appellees that up until within three or four years of his death Robert L. Caldwell was a man vigorous in both body and mind. At about that time he suffered from a spell of sickness, and thereafter a number of his lifelong friends and acquaintances observed that he was failing, both physically and mentally. It is not contended, however, that his mental condition had failed materially until within a very short time before his death. On the 30th day of May, 1908, he went to the city of Jacksonville and while there was taken ill. He was removed to the home of his son George, who resided in Jacksonville,

and remained there for several days. From that time on until the time of his death, on June 22, he was quite ill, and it was during that period that the greatest change was noticed in regard to his mental condition. The record does not disclose with whom he resided on his farm at this time, but it is apparent that none of his children resided with him. They visited him frequently, however, and about four days before the execution of the will in question, a nurse, Moses Mallory, was employed to attend him. At that time Caldwell was suffering from dropsy, with heart complications. The disease had progressed to the extent that he was no longer able to lie down but was compelled to assume a sitting posture at all times. Before June 18 the fluid secreted as a result of this disease had begun to fill the abdominal cavity to such an extent that the heart was materially affected, and the attending physician testified that this also affected his mental condition. Early on the morning of June 18 Caldwell suffered a stroke of paralysis, which affected one side of his face, his tongue and his vocal organs,' making it difficult for him to speak or be understood. His physician was summoned on this occasion and remained with him for a period of two or three hours. The son Lewis was there that morning and he summoned his brothers Samuel and James by telephone, and they arrived while the physician was there. When the physician departed Samuel told him that there were some papers to be made out and they were thinking of sending for a lawyer to have them made, whereupon the physician replied that his father was in no condition for such work now. Lewis then telephoned an attorney at Jacksonville to come to the home of his father to draft the will, and departed to secure another nurse. While they were awaiting the arrival of the attorney, the nurse, Mallory, was informed by Samuel that they had some writing they wanted to attend to and he was asked to leave the room. He returned every thirty minutes to administer medicine to his

patient.   On these occasions he testifies that he observed
Samuel engaged in writing; that James was talking to
Samuel and to his father, and that the father was sitting
in his chair, stooped over, crying.   It was shown that at
least a part of the writing done by Samuel at this time
was the preparation of a list of the full names of all the
children of Robert L. Caldwell and the writing of the
words "steam hay baler" and "North street property."
This memorandum so prepared by Samuel was given to
the attorney when he arrived and used by him in drafting
the will of Robert L. Caldwell, the steam hay baler being
bequeathed to one of the sons and the North street prop-
erty being the residence property in Jacksonville mentioned
in the devise for the benefit of Mrs. Hurley.   The will was
executed on that day in the presence of two of the neigh-
bors of Robert L. Caldwell who had been summoned by
one of the two sons present, as witnesses.   Both of these
men testify that no statement whatever was made by Cald-
well in their presence in reference to the will and no re-
quest made by him for them to sign as witnesses, the only
thing said to either of them on either of those subjects
being said by one of the sons or the attorney present.
Caldwell executed the paper by touching the end of the
penholder at the request of the attorney while the attorney
wrote his name.   Caldwell was a man able to read and
write and had always been accustomed to signing his own
name theretofore.   At noon of that day the nurse, Mallory,
left the employment of Robert L. Caldwell and his place
was taken by a trained nurse from the city of Jacksonville.
That evening Charles R. Caldwell, one of the sons, came
to see his father, arriving about seven o'clock.   The nurse
in charge would not allow him to see his father before the
next morning, on account of his weakened and serious con-
dition.   During the time from May 30 to the time of his
death the sons and neighbors and old friends of Robert L.
Caldwell called to see him, and by their testimony, offered

on the part of the contestants, it is shown that at the time of the execution of the alleged will the mind of Robert L. Caldwell was seriously impaired. Among the witnesses for contestants were three of the sons, George, Charles and Edwin, each of whom testified, and against his interest, that his father, at the time of the execution of the alleged will, was not mentally capable of transacting business of any kind. We have not attempted to detail all of the testimony offered on behalf of contestants, but it is clear that there is sufficient testimony to support the verdict of the jury.

It is contended that the court erred in admitting testimony on the question of the testamentary capacity of the deceased. A majority of those who testified on behalf of contestants gave it as their opinion that Robert L. Caldwell did not have mental capacity to transact business of any kind at the time of the execution of the will, and others that he did not have mental capacity to transact ordinary business. Appellants contend that this testimony fails to show a want of testamentary capacity and should have been excluded. In support of this contention they insist that it is not sufficient to show that the testator was mentally incapable of transacting ordinary business or transacting any kind of business. So far as it applies to the proof of inability to transact ordinary business that contention is well founded. It does not follow that one lacks testamentary capacity because he is mentally incapable of transacting ordinary business. But where the inquiry was whether Robert L. Caldwell was mentally capable of transacting any kind of business whatever it came within the proper rule, and a negative response would deny testamentary capacity. (*Hess* v. *Killebrew,* 209 Ill. 193.) Each witness, before giving an opinion as to the mental condition of Caldwell, detailed at length his means of knowledge, his opportunities for observing him and the facts upon which the opinion was based. Many of them

detailed facts and circumstances sufficient, in themselves, to support the conclusion that the testator lacked testamentary capacity.

Appellants also assign as error the action of the court in allowing contestants to prove declarations of the testator, made prior to the execution of the will, in reference to his intention to allow his property to descend as intestate property to his children. Over the objection of proponents, contestants were allowed to show that about two years before his death the testator stated to an intimate friend that he would be glad to know that after he was gone his estate would be settled up without trouble and that each of his children would share alike, and that about three months before his death he stated to another friend that he had not made any will and did not intend to make any and that he wanted everything divided equally among the children after he was laid away, and that about the same time he stated to his son Edwin, in the presence and hearing of Samuel, that the settlement of the estate of the testator's father-in-law by him had all been nice and straight and that that was the way he wanted his business settled, "each child to share alike." The declarations of a testator, made either before or after the execution of an alleged will, as to his testamentary intentions, are competent on the issue of testamentary capacity. (*Reynolds* v. *Adams,* 90 Ill. 134; *Bevelot* v. *Lestrade,* 153 id. 625; *Dowie* v. *Driscoll,* 203 id. 480; *Compher* v. *Browning,* 219 id. 429; *Waterman* v. *Whitney,* 11 N. Y. 157; *Sheehan* v. *Kearney,* 82 Miss. 688.) Such declarations, when not in conformity with the terms of the alleged will and made prior to its execution, are not, if standing alone, of any probative force. The mere fact that a man has changed his mind is in itself no indication of mental unsoundness. It is only in connection with other proof of lack of testamentary capacity that declarations of an intention contrary to the terms of the alleged will are competent and proper to be considered. In

this case there was such other proof, and the declarations of Robert L. Caldwell were properly admitted for the consideration of the jury.

Complaint is made as to the giving and refusing of certain of the instructions, but the points raised by counsel in that connection have already been discussed above and it will not be necessary to notice them further. The jury were fully instructed as to the law, and the verdict of the jury and the decree of the court being supported by a preponderance of the evidence, and there being no reversible error in the record, the decree of the circuit court is affirmed.

*Decree affirmed.*