INEZ E. AFTALION, Appellee, vs. ETHNOL M. STAUFFER et al. Appellants.

*Opinion filed June 20, 1918.*

1. WILLS—*mental capacity must be determined as of date of will in question although it is a copy of a former will.* Although a testatrix may have been competent to make, and did make, a former will, which she later destroyed and made a second will like the former from a photographic copy of the first, on a contest of the second will on charges of mental incapacity and undue influence the question to be determined is whether the testatrix had testamentary capacity when the last will was made, although the execution of the former will is an important circumstance to be considered.

2. SAME—*when decree setting aside will should not be reversed on evidence.* Where a will is contested on grounds of mental incapacity and undue influence, although there is testimony that the testatrix was of sound mind, a decree setting aside the will should not be reversed as contrary to the weight of the evidence, where a considerable number of credible witnesses intimately acquainted with the testatrix testify that she was not of sound mind in the year in which the will was executed and give good reasons for their opinions.

3. SAME—*when refusal to take issue of undue influence from jury is not reversible error.* Where a will is contested on grounds of mental incapacity and undue influence and the verdict is that the instrument is not the last will and testament of the testatrix, which finding is warranted on the ground that the testatrix was not of sound mind, a decree setting aside the will should not be reversed because the issue of undue influence was not taken from the jury, even though evidence to support that issue was very slight.

4. SAME—*when paper signed by testatrix is admissible on question of mental capacity.* A paper signed by the testatrix and three other persons and purporting to be a brief will bearing date a month previous to the execution of the will which is being contested on grounds of mental incapacity and undue influence, is admissible when limited to the issue of the condition of the mind of testatrix.

APPEAL from the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding.

HIRAM E. TODD, and HUGH E. WILSON, for appellants.

WEIL & BARTLEY, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellee, Inez E. Aftalion, as complainant in the court below, filed a bill in the circuit court of Peoria county to contest the will of her mother, Eleanor M. Edwards. The bill charged undue influence and want of mental capacity of the testatrix. Issues were made up and submitted to a jury, which returned a verdict finding the writing produced as the last will and testament of Eleanor M. Edwards was not her will. A motion by proponents for a new trial was overruled and a decree entered setting aside the alleged will and the probate thereof. From that decree proponents have appealed.

Eleanor M. Edwards was the widow of Isaac C. Edwards, who died about fourteen years ago. They resided in Peoria and had two daughters, contestant, Inez E. Aftalion, and proponent Ethnol M. Stauffer, their only children. Some time after her husband's death Mrs. Edwards went to Paris, France, where she resided temporarily the last few years of her life and where she died April 8, 1915. The daughter Ethnol resided with her mother while she lived in Paris and the daughter Inez resided in this country. In May, 1914, Mrs. Edwards returned to America, leaving her daughter Ethnol in Paris. After visiting with friends in New York a few days Mrs. Edwards went to Peoria, arriving there about the last of May. She lived at the Jefferson Hotel a few weeks and then went to live with her sister, who resided in Peoria. Late in the summer she became ill, suffered a stroke of paralysis and was taken to a hospital, where she remained about ten days. After leaving the hospital she lived with a brother in Peoria until about the middle of November, when, accompanied by her sister-in-law, Mrs. Baynard, she went to Chicago. There she secured rooms and board with a private family, where she lived until she departed to return to Paris, about the

middle of December. While in Chicago she visited her daughter Inez, who resided in that city, and spent Thanksgiving day at the home of Inez. A few days after Thanksgiving the daughter Ethnol arrived in Chicago from Paris. Prior to the arrival of Ethnol Mrs. Edwards called at the office of W. B. McIlvaine, a member of the law firm of Wilson, Moore & McIlvaine, and consulted him with reference to the revocation of a power of attorney she had given her daughter Inez before coming to Chicago. On the first day of December, 1914, accompanied by her daughter Ethnol, Mrs. Edwards went to the office of McIlvaine, where she executed the will in question. The first clause of the will directed that all her debts and funeral expenses be paid. The second clause stated the testatrix had theretofore given her daughter Inez all household goods, furniture and pictures used by herself and daughter in their apartments in Paris some years before while temporarily residing there; that she had also furnished her daughter Inez several thousand dollars for a musical education in Paris and had conveyed to her a large number of pieces of real estate in Peoria county, Illinois. By the third clause she devised and bequeathed to the daughter Ethnol all her property, real, personal and mixed, including her jewelry and clothing. Francis H. Tichenor was named executor. Mrs. Edwards died in Paris, France, April 8, 1915, and the will was admitted to probate in Peoria county, whereupon testatrix's daughter Inez filed her bill to contest and set aside the will and probate on the grounds above stated.

Three grounds are alleged and argued in the brief of proponents why the decree should be reversed: (1) The court erred in admitting incompetent evidence; (2) the court erred in denying proponents' motion to take the question of undue influence from the jury; and (3) the verdict and decree are contrary to the weight of the evidence.

W. B. McIlvaine testified he had met and transacted some business for Mrs. Edwards in 1910 and did not see

her again until shortly before November 21, 1914, when she came to his office to consult him about a power of attorney to Francis H. Tichenor, her attorney at Peoria, authorizing him to handle her property. Mrs. Edwards stated she understood Tichenor would send such an instrument to McIlvaine's office. She left her telephone number with him and asked him to notify her when it was received. McIlvaine received a letter from Tichenor a day or two later with reference to the power of attorney and notified Mrs. Edwards, who came to his office. McIlvaine told her he thought Tichenor should prepare the power of attorney as he was familiar with her property and wrote Tichenor to that effect. Tichenor prepared and sent to McIlvaine the document for execution and McIlvaine sent it by mail to Mrs. Edwards. A few days later Mrs. Edwards called at McIlvaine's office and objected to the instrument because it did not confer power to sell real estate. It was re-written and executed in McIlvaine's office. Mrs. Edwards said she had given a power of attorney to her daughter Inez authorizing her to manage her property, draw on her bank account, etc.; that she was dissatisfied with this and inquired what she could do. McIlvaine explained she could revoke it by another instrument, and he prepared the instrument of revocation, which she executed November 23, 1914. While these instruments were being prepared Mrs. Edwards produced a photographic copy of a will executed by her in Paris and said she wanted to execute another will so the witnesses would be available in this country. McIlvaine gave the photographic copy to a stenographer to copy. It was afterwards copied by the stenographer, and on December 1 Mrs. Edwards returned to McIlvaine's office and executed the will. It was witnessed by McIlvaine and two other men employed in his office. The daughter Ethnol was with her mother through the transaction when the will was executed. McIlvaine testified that in his opinion Mrs. Edwards had mental capacity to know and comprehend what

property she owned, what disposition she wished to make of it and to know and understand the business in which she was engaged. W. R. Dickinson, a witness to the will, testified he was introduced to Mrs. Edwards. He asked her if the paper was her will and she said it was. He saw her sign it, and at her request McIlvaine, himself and one Templeton signed it as witnesses. From what he saw of testatrix he believed her of sound mind.

The will, from a photographic copy of which the will in dispute was prepared, was executed in Paris June 30, 1913. Henry Charles Charpert, a lawyer then having an office in Paris, testified he prepared the will of that date at his office; that Mrs. Edwards, with whom he had become acquainted some months before, came to his office accompanied by her daughter Ethnol and asked him to prepare a will for her. He asked the daughter to step into another room. Mrs. Edwards explained what she wanted to do with her property. She said she wanted to give it to her daughter Mrs. Stauffer; that she had conveyed considerable real estate to Mrs. Aftalion and had advanced her various sums of money, and she asked to have those things mentioned in the will as the reason she left nothing to Mrs. Aftalion. The witness testified he believed Mrs. Edwards was of sound mind at the time she executed the will. Isaac Benjamin and John A. J. Smith were the witnesses to that will. Both testified in depositions that they were acquainted with Mrs. Edwards prior to the time they witnessed her will and that they believed her to be of sound mind at the time the will was executed. Other witnesses in France and America who knew Mrs. Edwards while she lived in Paris expressed the opinion that she had mental capacity to know and comprehend her property, the objects of her bounty and what disposition she wished to make of her estate. Several other witnesses residing in this country, some related by blood or marriage to Mrs. Edwards, testified to their opinions that she was of sound mind after her return to this

country from France, in the spring of 1914, and at the time the disputed will was executed. On the other hand, a considerable number of witnesses testified on behalf of contestant to actions and statements of Mrs. Edwards from which they concluded that she was not of sound mind from the time of her return to this country in 1914.

The issue made and tried was whether the instrument executed December 1, 1914, was the last will and testament, but in proponents' argument great stress is laid upon the fact that Mrs. Edwards had executed a precisely similar will in Paris in June, 1913. That, of course, is an important circumstance to be considered, but conceding she was then competent to and did make a will which she later destroyed and made a second will like the first, the question to be determined is whether she had testamentary capacity when the last will was made. Why the will of June, 1913, was destroyed but a photographic copy of it preserved is not explained. True, McIlvaine testified Mrs. Edwards said she wished the witnesses to her will to be residents of this country, but that does not explain what became of the will of 1913, and under the proof we are warranted in concluding it had been destroyed. So far as disclosed by the record the witnesses for the respective sides were equally credible. Some of the witnesses who testified for proponents, aside from those who witnessed the execution of the will in 1913 and the one in 1914, resided in Paris, two at least in New York, some in Chicago and some in Peoria. We shall not set out their testimony in substance. The witnesses testified to their acquaintance with Mrs. Edwards, their opportunities for observing her and forming an opinion of her mental condition. They testified that from her conversation and conduct they believed her to be of sound mind and capable of understandingly transacting the ordinary business affairs of life. Those who saw and conversed with her after her return from Paris, in 1914, believed her mental condition sound.

In the latter part of August or first of September, 1914, Mrs. Edwards had a paralytic stroke and was in the hospital about ten days, when she had sufficiently improved to leave there. Dr. Downs testified on behalf of contestant that on Thanksgiving day, 1914, he visited and made an examination of Mrs. Edwards at the home of her daughter Mrs. Aftalion, in Chicago. She was very nervous, and at his suggestion that she had no pain where she had previously said she was suffering pain she would agree there was no pain there. She had arterio sclerosis and had previously had a hemorrhage of the brain, causing paralysis. He diagnosed her case as senile dementia and expressed the opinion that she was incurable. Her conversation was disconnected, and in his opinion she did not have mental capacity to intelligently transact business. Dr. Bion, who treated Mrs. Edwards in Paris, testified on behalf of proponents that he visited her six times in January, 1915, four times in February, six times in March and eight times in April. She died on April 8. Mrs. Edwards was suffering, when the doctor was first called to treat her, from bronchitis and asthma. This condition was cured by the end of January. She then showed general weakness, with insomnia, ceased to take food and her strength decreased until she died from senile exhaustion. A considerable number of witnesses residing in Peoria and Chicago who knew Mrs. Edwards before she went to Paris, some of them intimately for many years, testified on behalf of contestant that she was not of sound mind in 1914. They gave the reasons upon which they based their opinions. They appear to have been intelligent and there is nothing in the record to indicate they were not credible witnesses. Without incumbering this opinion with the substance of what they testified to, it is sufficient to say that the actions, conduct and statements of Mrs. Edwards testified to by a number of them as the basis for believing she was not of sound mind seem clearly to have warranted that conclusion. If their testimony was

true,—and we would not be warranted in disbelieving it,—
the decree should not be reversed on the ground that it is
contrary to the weight of the evidence. *Judy* v. *Judy*, 261
Ill. 470; *Kellan* v. *Kellan*, 258 id. 256.

It is insisted there was no evidence to support the charge
of undue influence and that the court should have taken
that issue from the jury on the motion of proponents. The
jury did not make any specific finding upon the issue of
undue influence. The verdict was that the instrument was
not the last will and testament of Eleanor M. Edwards. If
that finding was warranted on the ground that she was not
of sound mind,—and we are of opinion it was,—the decree
should not be reversed even if there was no evidence to
support the charge of undue influence. However, the action
of the court in denying proponents' motion to take that is-
sue from the jury was not wholly unwarranted. There was
testimony tending to show that Mrs. Stauffer exercised a
strong influence over her mother. The most significant cir-
cumstances testified to were by Mrs. Hontie Jordan, a sis-
ter of Mrs. Edwards' deceased husband. From her testi-
mony it appears that Mrs. Edwards did not want to return
to Paris in 1914 but that she was influenced to do so by
Mrs. Stauffer against her own wishes. One circumstance
related by the witness was, that after Mrs. Stauffer came
over, in November, 1914, she was crocheting a shawl in
her mother's presence and was asked if she was knitting
for soldiers. She replied she was making a shawl for her
mother to wear on her return trip to Paris. Mrs. Edwards
said she supposed she would have to go to wear the shawl
but that she did not want to go. On the evening before
she left to return to Paris she called Mrs. Jordan by tele-
phone and asked her to come to see her. Mrs. Jordan re-
plied she lived so far away that she would rather come next
day. Mrs. Edwards said she was leaving the next day to
go "across the waters." Mrs. Jordan told her she would
meet her at the depot and inquired what train she was go-

ing on. Mrs. Edwards said she did not know what train she would go on or from what depot she would leave. Before leaving she had bought some plates and wanted to take them with her, but on Mrs. Stauffer's objection to her doing so she did not take them but gave them to her sister-in-law, Mrs. Baynard. In the presence of some of the witnesses when Mrs. Stauffer was not there she spoke affectionately of her daughter Inez, but on other occasions, some of them when Mrs. Stauffer was present, she spoke unkindly of her. Mrs. Stauffer accompanied her mother to the lawyer's office in Paris when the will of 1913 was executed. The lawyer testified she came to his office with her mother and asked to have the will prepared. At his request Mrs. Stauffer stepped into another room while he went over the matter with Mrs. Edwards as to how she wanted to dispose of her property. Mrs. Stauffer also went with her mother to McIlvaine's office and was present when directions were given for preparing the will in controversy. Taking into consideration the testimony as to the mental condition of Mrs. Edwards, the testimony tending to show the stronger mind and dominating will of Mrs. Stauffer referred to and slighter circumstances not mentioned herein, and the circumstances under which the will was made, there was no reversible error in the ruling of the court denying proponents' motion to take the question of undue influence from the jury. *Lloyd* v. *Rush,* 273 Ill. 489; *Donnan* v. *Donnan,* 256 id. 244; *Weston* v. *Teufel,* 213 id. 291.

It is insisted the court erred in admitting in evidence on behalf of contestant, over proponents' objections, a paper designated in the record exhibit 2. The paper is as follows:

"Being of sound mind and will, I declare this to be my last will and testament and hereby annul all previous wills. In the event of my death I wish everything I possess to be divided equally between my two daughters.

Sunday, November 8, 1914."

It was signed by Mrs. Edwards and also by three other women. Its offer was limited to the issue of the condition

of Mrs. Edwards' mind, and in admitting it the court limited it to that purpose. For the purpose for which the paper was offered and admitted it was competent. *Hurley* v. *Caldwell,* 244 Ill. 448; *Dowie* v. *Driscoll,* 203 id. 480; *Reynolds* v. *Adams,* 90 id. 134.

The decree of the circuit court is affirmed.

*Decree affirmed.*