(No. 14312.—Decree affirmed.)

MARY HOLLAND *et al.* Appellees, *vs.* THE PEOPLE'S BANK AND TRUST COMPANY, Exr. Appellant.

*Opinion filed June 21, 1922.*

1. WILLS—*when verdict in will contest case will not be disturbed.* Where the testimony on either side in a will contest case is such as, uncontroverted, will justify a finding either for or against the complainants, the Supreme Court will not disturb the verdict and decree setting aside the will.

2. SAME—*when failure to withdraw issue of undue influence is not prejudicial.* Where a will is contested on grounds of mental incapacity and undue influence, the denial of a motion to withdraw the issue of undue influence is not prejudicial error even if there is no evidence to sustain that charge, where the finding that the will was not the last will and testament of the testator is supported by testimony that he was not of sound mind.

3. SAME—*when person named as executor in former will is a competent witness in contest case.* In a will contest case a witness is not rendered incompetent because he was named as executor in a prior will which he had written for the testator, where he testifies that he waives any right to qualify as executor should the prior will ever be presented for probate.

4. SAME—*effect where a will is in testator's handwriting—instruction.* The fact that a will is in the testator's own handwriting does not justify an instruction stating that if the will is rational on its face and disposes of the testator's property in a rational way "such fact may of itself establish testamentary capacity," as the fact that the will is in the testator's handwriting is only a circumstance tending to show mental capacity and does not of itself establish such capacity if other evidence shows he was insane.

5. EVIDENCE—*what interest is necessary to disqualify a witness.* The interest which, under the Evidence act, will disqualify a witness in a proceeding to contest a will must be a legal interest in the result of the suit and must be certain, direct and immediate.

6. APPEALS AND ERRORS—*objection to competency of witness can not be made for first time in Supreme Court—minors.* A particular objection to the competency of a witness cannot be made in the Supreme Court if the objection was not made at the trial even though the competency of the same witness was objected to on other grounds, and the fact that a guardian *ad litem* made no objection in behalf of infant defendants does not authorize another party to complain of the alleged error, especially where the prayer of the guardian for an appeal was denied, presumably upon the ground that an appeal would not be in the interest of the infants.

APPEAL from the Circuit Court of Winnebago county; the Hon. EDWARD D. SHURTLEFF, Judge, presiding.

FRANK M. RYAN, (ROY F. HALL, and CHARLES W. FERGUSON, of counsel,) for appellant.

FISHER, NORTH, WELSH & LINSCOTT, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

The bill in this case was filed to contest the will of Anthony Torbert, deceased. The bill alleged Torbert was of unsound mind and memory, that he was in his dotage, and his mind was so impaired as to render him incompetent to make a valid will; that he had previous to making the will been adjudged a feeble-minded person and a conservator had been appointed for him. The bill also alleged that certain persons interested in certain alleged claims against Torbert, based on sales of worthless stocks and bonds to him, exercised undue influence and practiced fraud on him, and resorted to falsehood and misrepresentations to induce him to execute the alleged will. Testator was about eighty-four years old at the time of his death, which occurred September 7, 1918. His wife had died about four years previously. His will was executed December 15, 1916. His only heirs were four married daughters, each of whom had one or more children. The will was written with a pen by testator and is as follows:

"This is the last Will and Testament made by me on this 15th day of December, 1916.

first I want the Peoples bank and Trust Company to act as executor & trustee.

second I want all of my deabths and funeral expenses to be paid

Third I give and devise all my property to the peoples bank and Trust Company in Trust to pay out of the income to each of my four daughters, Etta, Mary, Ada Bell, and Edith, a fourth of such income on or about the first day of each month as long as they live, & to pay such income to them personally & not to any agent or attorney for them, I do not want them at any time to go in debt anticipating these payments

Fourth, at the death of any one of my daughters, I give to the children of such daughters, who may survive their mother a one fourth share of my whole property to be the absolute property of such children.  It is my intention that only those of my grandchildren who survive their mothers shall participate.  And I direct that at the death of any one of my daughters that my Trustee and executor shall with the aid & advice of the County Judge of Winnebago County distribute and divide among the surviving children of that deceased daughter the one fourth of my entire property as above provided.  No grandchild shall dispose of any of his or hers contingent interest before the death of such grandchilds mother—

Fifth, In my lifetime I have advanced some money to my daughters, and it is my wish that my Trustee collect it as follows, to Mary Holland I loaned $125 dollars for an operation, and also loaned Mary Holland $500 dollars for legal matters in her divorce case in Kansas.  there is a claim I have against Walter Holland for $30 dollars for rent advanced about the year 1894 for the comings farm just west of the Cutler estate just down the river road. as to the money which Ada Bell Delbridge owes me amounting .$374. dollars and also the $600 dollars paid to Dr. Carter by me I do not wish my Trustee to collect this amount, but I give this to Ada Bell.

Sixth; I consented last April 1916 to let my old friend Harry Andrews act as my conservator at the urgent request of my daughters and therefore I do not wish that any of my daughters, or any one for them shall attempt to break or set aside this my last Will, and if any of my daughters do attempt to set aside or break this will that daughter or daughters trying to do so shall be cut off with one half of her share as above provided, and the extra amount given daughters who do not attempt to break this my last request of them

7th, I request that my Trustee do not sell for a period of at least 5 years either my old farm in Ogle County or my share of of the

Dakota land now owned by H. B. Andrews and myself, or Sell my Speculative Stocks for a period of 3 years

I, Anthony T. Torbert, on this 15th day of December, at the age of 83 years have writen with my own pen these foregoing lines 55 in number as my last will & testament, and have seald and declared this my will in the presence of the undersigned, who at my request and in my presence, and in the presence of each other have signed their names hereto as attesting witnesses. These witnesses have been informed by me that I have Harry Andrews, as conservator attending my business, but I believe that I am able able to make the above will, disposing of all of my property, both real & personal to those who are the natural objects of my bouunty.

ANTHONY T. TORBERT.

We the undersigned attesting witnesses in the presence of Anthony T. Torbert and in the presence of each other do hereby subscribe our names as witnesses to Mr. Torbert's last will and testament. And we certify that we have heard the foregoing will read in person by Mr. Torbert, have each of us seen him sign his name and have signed our own names in the presence of each other.

DAVID TURKENKOPH,
ARTHUR W. ROBERTSON,
FRANK J. O'BRIEN,
IRA C. JOHNSON."

The will was admitted to probate and the four daughters filed the bill to contest and set aside the will and its probate. The People's Bank and Trust Company, named as executor and trustee, and all the testator's grandchildren, were made defendants. A guardian *ad litem* was appointed for the grandchildren who were minors. The executor and trustee answered the bill denying its allegations, and the guardian *ad litem* answered for the minors. An issue was made up and submitted to the jury whether the paper purporting to be the last will and testament of Anthony Torbert was his last will and testament. A trial was had, and the jury returned a verdict that the writing offered in evidence was not the will of Anthony Torbert. The court overruled a motion for a new trial and entered a decree setting the alleged will and its probate aside and declaring them null and void. The executor prosecutes this appeal from that decree. The court denied the prayer of the guardian *ad litem* for an appeal.

Twenty-four witnesses for each side testified on the trial of the case, and, as usually occurs in such cases, the testimony was conflicting. The testator had until the last few years of his life been a man of strong mentality, read a great deal and had good health. He had accumulated his property, which at the time of his death was of the value of $106,000. It consisted of a farm of 200 acres in Ogle county, unimproved land in North Dakota, some land in Texas, and properties in and near Rockford. His residence was in Rockford, and was occupied at and before his death by his daughter Mrs. Lumley and her son by a former marriage, Ronald Smith, with whom he lived the greater part of the time. His personal property of any value consisted of stock in the Andrews Wire Works, at Rockford, notes and mortgages and Liberty bonds. He also owned some speculative stocks, which appear to be of no value. Before a conservator was appointed for him he signed a note for $5000 or $6000 in connection with the Dominion Gravel and Dredging Company, which company appears to be worthless. He also bought some bonds of the Sycamore and Woodstock Traction Company which were of no value, and gave his note for a large amount to a man named Elmore, because Elmore told him his bank account was limited and he had to have more money to make business go. These notes turned out to be judgment notes and became the property of the DeKalb Trust and Savings Bank, and the bank later took judgment by confession on the notes.

In March, 1916, testator called on Harry B. Andrews, a lawyer in Rockford who was his personal friend and adviser, and asked Andrews if he would act as conservator for him. He said they (evidently meaning his daughters) were insisting that a conservator be appointed for him, and he was willing provided Andrews would act. Andrews consented to act as conservator if he and his four daughters were willing that he should. Shortly thereafter the daughters filed a petition in the county court for the appointment

of a conservator. Torbert resisted the appointment, and after a trial had progressed two or three days, he, his four daughters and their attorney went to Andrews' office. An agreement was there reached that Andrews should be appointed conservator, and Torbert signed the following paper, dated April 15, 1916, addressed to the county judge:

*"To Honorable Judge Louis M. Reckhow:*

"I hereby request that a conservator be appointed for me, and that my attorney, Harry B. Andrews, be appointed as such conservator and that he give bonds for same according to law. I agree that the jury may make a finding that a conservator may be appointed, as I feel that on account of my advancing years I am unable to properly care for my estate.        A. T. TORBERT."
Dated April 15, 1916.

Thereupon the trial ended and Andrews was appointed and qualified as conservator and so continued until Torbert's death.

The will was executed December 15, 1916, in the directors' room of the Winnebago National Bank, at Rockford. The testator, accompanied by one of the appellant's solicitors, went to the bank on that occasion, the testator having in his possession the will written by himself. Two of the witnesses to the will, O'Brien and Robertson, were assistant cashiers of the bank. Turkenkoph was a clothing merchant and Johnson proprietor of a laundry. Johnson was requested to come to the bank by the attorney, and Turkenkoph did not remember who requested him to come. All four of the witnesses went into the directors' room with Torbert and the attorney and they were asked to sign the will as witnesses. It had not been then signed by the testator and the attestation clause had not been written. That was written in the bank by Robertson and was dictated by the attorney. The testator read the will aloud, then signed it, after which it was signed by the four witnesses. At the request of the testator Robertson took the will and put it in testator's box in the bank. Testator also left his key to the box with Robertson.

The four witnesses to the will testified on the trial that they believed the testator possessed mental capacity to intelligently and understandingly do what he did there. The other witnesses on behalf of proponents, some of whom had had business transactions of a not very important nature with the testator about or after the time the will was executed, testified they believed the testator was of sound mental capacity and capable of knowingly and understandingly transacting business at the time he made his will. After Andrews had been appointed conservator the DeKalb bank filed a bill in the circuit court of Ogle county to set aside a deed made by Torbert to his daughters of the farm in that county, as a fraud on his creditors. Andrews, as conservator, filed a cross-bill to set aside the same deed, and it was set aside. Torbert testified as a witness on the trial of the case and a transcript of his testimony was introduced in evidence by proponents on the trial of this case.

Dr. Day was the only medical witness who testified on the trial. He was a witness for contestants, and testified the first time he was called to treat the testator was February or March, 1917. Testator was then at the house of his brother-in-law, St. John. The doctor treated the testator from then on until his death, the testator many times visiting the doctor at his office. The testator was then eighty-three years old, and the doctor testified he had senility of both body and mind, which is called senile dementia. Testator lived with his daughter Mrs. Lumley, and in January, before the doctor first saw him, he had gone from her house to St. John's, where he stayed until April of the same year. The doctor said when he called to see testator at St. John's testator said he had been sleeping in some awful place,—a nest of some sort,—and having a bad time. Mrs. St. John testified he told the doctor he had taken cold by sleeping in the cat's nest; that he had slept in the cat's nest from ten o'clock one day until three o'clock the next day. She said he had been staying at their house and had

not been in any cat's nest. Dr. Day described the symptoms, characteristics and effects of senile dementia, and said it was a progressive lessening of the mental functions; that its most common characteristic is inability to retain recent knowledge that comes to the individual. They practically all have a very good memory of things which occurred earlier in life but cannot remember recent occurrences very well. The doctor testified Torbert had some heart trouble, which caused him discomfort and for which the doctor treated him, but he had lost a greater per cent of mental than physical vigor. Some days a person so afflicted would have a clearer mind and better grasp on what he was doing than on other days, and what might be desirable to such person on one day or time would be undesirable on another day or at another time. One of the characteristics of persons so afflicted is that they become antagonistic to old friends and persons they formerly liked and trusted and become attached to and repose confidence in strangers. The doctor said he was not prepared to say that if Torbert wrote the will himself December 15, 1916, while free from outside influence, he did not then know what was in it, but he said it was a fact that some days his mental condition was better than on other days; that at times he might know what property he had and at others would not, but basing his opinion on what he knew and observed of Torbert from the time he first saw him until his death, the doctor stated he was not in a mental condition on December 15, 1916, to prepare such an instrument as his will and know and understand its effect and consequences. A person afflicted with senile dementia becomes more and more subject to temporary whims and vagaries and is very changeable.

Andrews, the conservator, on behalf of contestants, testified at great length, but we shall not attempt to even summarize his testimony. He testified that shortly after the death of Torbert's wife his failing mentality became notice-

able, and witness related many incidents and circumstances he observed from time to time in the conduct and conversations of Torbert which indicated a failure of mental power and seemed incompatible with sound mind. Witness testified that in his opinion testator was insane from January 1, 1916, until his death, and the incidents he related upon which he based that opinion were of a character to give it some support. Andrews' partner, Essington, who knew and saw much of the testator, corroborated the testimony of Andrews and related many incidents and occurrences and conduct and conversations of the testator upon which he based his belief and opinion that he was insane.

Many of the witnesses for contestants who testified Torbert was insane related the reasons for their opinion. Some of them were, that he would get lost in the city where he resided, and sometimes in the neighborhood where he lived, and would have to be conducted to his home. On one occasion when he was staying at St. John's he went to the house of someone else near the St. John house and tried to get in. He thought a residence back of the St. John home, where there were some milk bottles on the porch, was a milk depot. He planted peach trees three feet apart because he said the more trees there were the more fruit there would be, and he watered the trees when there was snow on the ground and when the ground was frozen. While at St. John's he would go to bed in the rooms of other members of the family instead of his own room. Mrs. St. John testified he went to bed in every room up-stairs. At one time she found him on a bed which had nothing on the bedstead. He would take a nap in the afternoon, and when he awoke he would think it was morning, would wash and prepare for breakfast. He released a real estate mortgage on real estate to secure a note for $1000 without payment of the note. He could not give any coherent reason for his action when asked about it, but finally said he might have released it because the mortgagor told him that would

enable him to avoid paying taxes on it. Many other circumstances were related by the witnesses of acts and conversations of Torbert which would seem to indicate his mental faculties were impaired. It would unduly lengthen this opinion to further attempt anything like a recital of the testimony and we believe would serve no useful purpose.

The principal part of appellant's argument is devoted to the proposition that the verdict of the jury and the decree of the court are contrary to and not warranted by the evidence. Proponent's evidence tended to show Torbert possessed sufficient mental capacity to make a will, and contestants' evidence tended to show his mind and memory were so impaired that he could not understandingly execute a will. Contestants' evidence did not, as contended, tend to show merely that Torbert, due to old age, was feeble in mind and body, but tended to show he was so mentally unsound as to be incapable of understanding the business of making his will. In such a situation the question is properly submitted to the jury for determination. This court has held that where the testimony on either side is such as, uncontroverted, would justify a finding either for or against the complainants, a reviewing court will not disturb the verdict and decree, even though it might entertain a different view from the court below if the evidence were submitted to it as an original proposition. (*Wilcoxon* v. *Wilcoxon,* 165 Ill. 454; *Bundy* v. *West,* 297 id. 238.) Any attempt to set out the evidence in detail could only serve the purpose of showing it was conflicting. There is nothing in the record to indicate the witnesses on one side were more intelligent or credible than those on the other side. Considering the entire evidence on both sides, without expressly referring to it in detail, it cannot be said the decree of the circuit court is manifestly contrary to the evidence and should be reversed on that ground. *Judy* v. *Judy,* 261 Ill. 470; *Kellan* v. *Kellan,* 258 id. 256; *Aftalion* v. *Stauffer,* 284 id. 54.

At the conclusion of the evidence appellant moved the court to withdraw from the consideration of the jury the question of undue influence, whereupon appellees asked and obtained leave, over appellant's objection, to amend the bill so as to charge that the testator was unduly influenced by certain persons or person unknown to complainants, and the court denied appellant's motion to withdraw the question of undue influence from the jury. This action of the court, it is claimed, was reversible error. The nature of the amendment was such that appellant was not prejudiced by it. No specific finding was made by the jury on the question of undue influence, but the finding was that the instrument was not the last will and testament of Torbert. We have held that if the finding was supported by the testimony that the testator was not of sound mind, the decree should not be reversed even if there was no such evidence to sustain the charge of undue influence. *Aftalion* v. *Stauffer, supra; Bundy* v. *West, supra.*

When Andrews was offered as a witness by appellees his competency was objected to by appellant. He testified, out of the presence of the jury, that some time in 1915 he had written a will for Torbert in which the witness was named as executor. That will appears to have been lost or destroyed,—at least it has not been found. On the ground that the witness was an interested party under the provisions of that will his competency to testify was objected to. He testified he waived any right to qualify as executor should the will in which he was named executor ever be presented for probate. The interest which will disqualify a witness under the Evidence act must be a legal interest in the result of the suit and must be certain, direct and immediate. (*Ackman* v. *Potter,* 239 Ill. 578; *Bellman* v. *Epstein,* 279 id. 34.) The possible interest of the witness was very uncertain and remote. He was a competent witness.

We think it very probable, as contended by appellant, that some incompetent questions were asked and permitted

to be answered. There is scarcely a case·tried where the testimony is so voluminous as in this case where that does not occur, but unless it is of a more prejudicial character than that which occurred on the trial of this case it affords no reason for a reversal of the decree. The record is as free, we believe, from prejudicial error in that respect as will usually be found where there is such a large mass of testimony.

The court gave for appellant an instruction that if the will was in the handwriting of the testator there is a presumption that he executed it voluntarily and unaided, and that presumption must obtain until the contrary is shown by the evidence. The court refused an instruction asked by appellant which stated the same proposition and continued that if the will appeared rational on its face and disposed of testator's property in a rational way, "such fact may of itself establish testamentary capacity." We think there was no error in refusing that instruction. The will was in the handwriting of the testator, but when or where or under what circumstances it was written is not disclosed by the evidence. There was much testimony that he was not of sound mind when it was executed, but the jury would be likely to understand from the instruction that the fact that the will was in testator's handwriting of itself established testamentary capacity. If he was, in fact, insane when he executed the will, the fact that it was in his handwriting would not render it valid. That it was in his handwriting was a circumstance tending to show mental capacity, but would not of itself establish such capacity if other evidence showed he was insane.

Some other complaints are made of a few instructions, but they are not important in character. The jury were fully and fairly instructed as to the law governing the case.

We find no error in the record which would warrant a reversal of the decree, and it is affirmed.

*Decree affirmed.*

Subsequently, on petition for rehearing, the following additional opinion was filed:

Per CURIAM: The foregoing opinion was adopted at the February term and a judgment was entered affirming the decree of the circuit court. At the April term a petition of the appellant for a rehearing was allowed because of the question of the competency of Harry B. Andrews as a witness. The petition contained other points, also, which it was suggested had been overlooked or misapprehended. They were not overlooked, for the opinion discusses the merits of all those points, though it does not always agree with the conclusions of the appellant's counsel in regard to them or in regard to their weight and importance. We have again considered the record with reference to these points and the arguments of counsel and have reached the same conclusion as on the former hearing.

In regard to the witness Andrews, the appellant contended in its original brief that his whole testimony was incompetent on account of his interest, because he was the conservator of the testator and as such conservator had the right to administer the estate of the testator in case the will were set aside, and also because there was a prior will of the testator, which had been duly executed, in which Andrews was named as executor. In the opinion filed at the February term this objection, so far as it related to the prior will, was discussed and held insufficient because the interest of the witness was not a direct interest in the result of the suit but was a possible contingent and indirect interest, too uncertain and remote to constitute a disqualification. The objection because of the witness having the right, as conservator, to administer the estate of the decedent if the will were set aside was mentioned in the brief but was not considered, because the argument as to the question was devoted entirely to the other objection. We are satisfied with what is said in the opinion as to that objection.

The answer of the appellees to the petition as to the objection because of interest of the witness Andrews as conservator is that that objection was not made in the circuit court, and an examination of the record shows that this is true. The objection because of interest was based entirely on the prior will, and the question of the conservatorship was not mentioned in that connection. The objection appears in the appellant's brief but not in the record. Since it was not made on the trial it cannot be made for the first time in this court.

It is suggested by the appellant that some of the defendants were minors, and that the duty of the court to minors did not end with the appointment of a guardian *ad litem* but it was the duty of the trial court not to permit the testimony of an incompetent witness to be used to deprive the minors of the estate devised to them by the will even though the guardian *ad litem* did not object. The only appellant in this court is the People's Bank and Trust Company,—the executor named in the will. It is true that the court will protect the interest of minors and will not permit their rights to be lost through the neglect of a guardian *ad litem*, but this rule does not authorize another party to complain of errors of which an infant may complain but does not. The infants do not join in this appeal. They prayed an appeal through their guardian *ad litem*, which the court denied. It is to be presumed that the reason was that in the judgment of the court such an appeal would not be in the interest of the infants. Whatever the reason, the infants are not here complaining of the action of the court and no other party can complain in their behalf.

The former opinion is again adopted as the opinion of the court, and the decree is affirmed.    *Decree affirmed.*