(No. 20454.—)

CARRIE MILES, Appellant, *vs.* S. E. LONG *et al.* Appellees.

*Opinion filed February 18, 1931.*

Ray I. Klingbiel, (Dan H. McNeal, of counsel,) for appellant.

Fred H. Railsback, for appellees.

Mr. Justice Farmer delivered the opinion of the court:

Appellant, Carrie Miles, filed her bill December 22, 1927, in the circuit court of Rock Island county, against S. E. Long, Harry Lewis, Margaret Lapeere, Adeline Bell, Gertrude Bell, the Mount Zion Colored Baptist Church, the African Methodist Episcopal Church, and Charles Long and Emil Lapeere, executors of the last will of Carrie Love, to contest the will of Carrie Love, which was admitted to probate in that county on December 21, 1927. Appellant charged in her bill that the testatrix was not of sound mind and memory at the time she executed the instrument, and that S. E. Long, Charles Long, Emil Lapeere, Margaret Lapeere and Adeline Bell procured its execution by undue influence. The defendants named in the bill filed joint and several answers denying the material allegations of the bill. There was a trial by jury, and at the close of all the testimony the trial court, on motion of the defendants, who are appellees here, instructed the jury to find that the instrument offered in evidence was the will of Carrie Love. A verdict was returned in accordance with the instruction, a motion for a new trial was denied and a decree entered in favor of appellees. From that decree an appeal has been perfected to this court.

The reason urged in this court for a reversal of the decree is that the court erred in giving the peremptory instruction to find for the proponents of the will.

The evidence shows that Carrie Love, who lived in East Moline, Illinois, for fifteen years or more, died there Sep-

tember 16, 1927, at the age of about sixty-five years, leaving as her only heirs-at-law, appellant, who is her niece, and three nephews, all of whom were apparently non-residents of this State. Testatrix was a colored person, born in slavery at Simpsonville, Kentucky, where she was raised. She was unable to read or write but was keen and bright and capable of carrying on an intelligent conversation. She lived in St. Louis for a while and then moved to East Moline, where Sanford Love, her husband, was employed by the John Deere Harvester Company from about 1915. His foreman there was Charles Long, one of the appellees in this litigation. The Loves lived in a three-room house on Eighteenth avenue, near Fourteenth street, after 1919, and she did washings for Mrs. Long. Mr. and Mrs. Long came to Mrs. Love's house frequently. Love died during the early part of January, 1926, and Mrs. Love and Mrs. Loretta Lawrence took the body to St. Louis for burial. On their return to East Moline Mrs. Love contracted a severe cold. After being ill at her home for three or four days she was taken to St. Anthony's Hospital in an ambulance. Dr. Bollaert, who treated her, said she had a very severe bronchitis and was in a critical condition. A special nurse was in charge of her for at least a part of the time. The doctor stated there was not much of the time during the first two or three weeks that she was really rational, and toward the latter part of her stay at the hospital she was rational about half the time. The doctor also said she was very hard of hearing, which was caused by an infection of the middle ear, and that her blood showed a four-plus Wasserman, indicating the presence of a syphilitic condition. While she was in the hospital in January, 1926, Charles Long called attorney S. E. Long, who had practiced law for eleven years in East Moline, to see Mrs. Love at St. Anthony's Hospital. S. E. Long had known Mrs. Love for five or six years and had acted as her attorney during that time. He drove out alone to the hospital the morning he

was notified and interviewed Mrs. Love about her will.
Mrs. Charles Long and the nurse were present in her room.
Mrs. Love told the attorney she was worried about her will;
that she wanted her funeral expenses paid, wanted to give
the churches some money and wanted her foster daughter,
Adeline Bell, of St. Louis, whom she had raised from a very
small child but had not adopted, to get the bulk of her prop-
erty. Attorney Long took down the notes for her will and
went back to his office to write the instrument. Charles
Long went to attorney Long's office with him and returned
with the attorney to the hospital. Upon their return to Mrs.
Love's room the attorney read the will to her in the presence
of the nurse and Mr. and Mrs. Charles Long, and the two
latter persons were witnesses to the will. The instrument
was given to the testatrix. Mrs. Love returned home from
the hospital and was visited there occasionally by her friends
and acquaintances as before. Her health improved so that
she was able to go places. One of appellant's witnesses
testified that Mrs. Love completely recovered from her ill-
ness, but the record tends to show that she was never again
as well as prior to the time she went to the hospital in
January, 1926. On June 10, 1926, someone called attor-
ney Long over the telephone and informed him Mrs. Love
wanted to see him at her house. He went to her home,
was invited to come in, and she told him she wanted to
change her will and did not feel able to go up to his office
because climbing the stairs affected her heart. No one was
present at that time except Mrs. Love and attorney Long.
She told him what she wanted in the will and how she
wanted to dispose of her property. The attorney took notes
of what she said and told her he would go to his office and
have the will written on the typewriter. Mrs. Love told
him to bring his stenographer, Miss Harris, or somebody
else, when he came back. The attorney returned to his
office, dictated the will to Miss Harris, his stenographer,
who wrote it on the typewriter, and he and the stenographer

returned to Mrs. Love's house the same morning. The only persons present at this time were Mrs. Love, the stenographer and the attorney. He read the will over to her and she said it was exactly what she wanted. They discussed the various clauses of the will. The first clause of the will provided that her debts and funeral expenses be paid and that the latter should not exceed $300. The second clause gave to each of two colored churches in the city of East Moline the sum of $100. By the third clause she gave to Mrs. Lapeere $100, and she told the attorney that Mrs. Lapeere had been very good to her. She gave her nephew, Harry Lewis, the sum of one dollar under the fourth clause of her will. She said to the attorney that Harry Lewis was her only relative that she knew of, and she did not want to leave him any money because he would gamble it all away, but she wanted him mentioned, and that she would leave him one dollar so that he could not break the will. The fifth clause of the will provided that her executors should sell her residence property, which was described, and the proceeds were to be given to Gertrude Bell, a daughter of Elmer and Adeline Bell, of 2523 North Leffingwell avenue, St. Louis, Missouri. By the sixth clause she gave $300 to a certain named cemetery in St. Louis, to be invested by its officers and the interest used for the care of her lot in that cemetery, in which lot she desired to be buried. By the seventh clause she provided that after the payment of the amounts and the division of her property as previously expressed, the remainder was to go to Adeline Bell, of St. Louis, whom she had taken care of and raised from a child but had never adopted. The eighth clause designated Charles Long and Emil Lapeere executors of her will. She stated to the attorney that she wanted Long executor because her husband had worked for him quite a few years and she knew if Long had anything to do with it he would respect and follow out her wishes to the letter. She said Lapeere had been a neighbor and she wanted him to also

act as executor. She told her attorney she wanted to sign the will and fix it up as he had drafted it. The will consisted of three pages, and the testatrix being unable to write, placed a cross at the bottom of each of the three pages and at the conclusion of the will. The attorney wrote the word "Carrie" before the cross and the word "Love" after the cross; also the word "her" above the cross and the word "mark" below the cross, and opposite each cross he and his stenographer, Miss Harris, signed their names as witnesses to her mark. After the will was executed and attested in the presence of the three persons named the instrument was given to Mrs. Love.

The record shows that Mrs. Love had been in attorney Long's office on several occasions and had talked with him prior to the death of her husband and before she went to the hospital, about making a will. She told him that she should make a will because Harry Lewis, her nephew, would get her property if anything should happen to her, and that he had not treated her very good and she did not want anything to do with him. She said she had other relatives but did not know where they were; that they had gone from Kentucky to Indiana and that she lost track of them. About March, 1927, it appears that Mrs. Love discovered that she had some other relatives living, and Carrie Miles, who was her niece and is the appellant here, came from Indiana to visit her aunt for a few days during the latter part of August or the early part of September, 1927. The testatrix reported the visit of her niece to attorney Long and told him that she had a notion to change her will a little bit, but said to him in answer to a question from him, "No, I don't want to do it to-day." A little later she saw Long on the street, and he asked her if she was coming down to change her will. She replied, "No, Mr. Long, I was just going to the Manufacturers Bank, but I have made up my mind I am just going to leave my will for the present anyway."

Edna Harris, who had been a stenographer in attorney Long's office for the last ten years, corroborated the testimony of S. E. Long relative to the circumstances concerning the making, execution and attestation of Mrs. Love's will on June 10, 1926. She knew the testatrix, had talked with her several times, and thought her to be keen and bright mentally. W. A. Stewart, the minister of the African Church in East Moline; F. T. Sherman, an officer of a bank in East Moline where the testatrix had an account; Nettie Moody, a young colored girl who was a high school graduate with the class of 1925 and who had known the testatrix for a long time and had read and explained things of a business nature to her, and B. H. Ryan, assistant cashier of the State Bank of East Moline, where Mrs. Love also had an account, were all of opinion that she was of sound mind at the time she executed her last will and testament.

In a will contest a motion to direct a verdict for the proponents at the close of all the evidence is governed by the same rules as in actions at law. The party resisting the motion is entitled to the benefit of all of the evidence in the case, considered in its most favorable aspect to him, together with all reasonable presumptions to be drawn therefrom. Where the law provides for a jury trial, if there is any evidence fairly tending to prove the issue, although it may be opposed by a greater weight of the testimony, the question should be submitted to the jury. *Flanigon* v. *Smith,* 337 Ill. 572; *Bowles* v. *Bryan,* 254 id. 148; *Libby, McNeill & Libby* v. *Cook,* 222 id. 206.

The proof offered by appellant to sustain the charge that the testatrix was of unsound mind and memory is so meager that it requires little consideration. It consisted of statements by one witness that the testatrix was changeable; by another witness that she was sick and weak in the early part of June, 1926, that her bowels were deranged and her head was swimming; by a third witness that Mrs. Love was

worried and flighty after her husband's death, and by the doctor who attended her at the hospital in January, 1926, that she was irrational part of the time and that he believed her sickness continued until her death. Unsoundness of mind cannot be inferred from proof of old age, distress or physical disability. A testatrix does not have to be absolutely of sound mind and memory in every respect in order to have sufficient mental capacity to make a will. She must at the time she makes her will have sufficient mental capacity to know the natural objects of her bounty, to comprehend the kind and character of her property, to understand the particular business in which she is engaged and to make disposition of her property according to some plan formed in her mind. (*Flanigon* v. *Smith, supra; Applehans* v. *Jurgenson,* 336 Ill. 427; *Williams* v. *Ragland,* 307 id. 386.) If a testatrix has sufficient mental capacity she may make an unequal division or distribution of her property among her heirs, or she may, if she so desires, give all of her property to strangers. (*McGrady* v. *McGrady,* 298 Ill. 129.) There was no evidence presented which fairly tended to show that Mrs. Love was incapable of making a will at the time her last will and testament was executed, and the court was not in error in directing a verdict in favor of appellees on that charge.

The bill of appellant charged that the execution of the will was procured by the undue influence of S. E. Long, Charles Long, Emil Lapeere, Magaret Lapeere and Adeline Bell. There was no proof whatever on the part of appellant to show that Adeline Bell, who resided in St. Louis, had ever talked with the testatrix, or any of the persons connected with this litigation, about the provisions of the will wherein she and her daughter were named as beneficiaries. In fact, the record does not disclose that she or her daughter even knew that a will was to be or had been made. Neither does the record show that S. E. Long had said or done anything in his business association with the testatrix

as her attorney for five or six years except such as his client had desired and requested of him. Two of appellant's witnesses testified that Charles Long and his wife and Margaret Lapeere, all of whom are white persons, made frequent visits to the home of Mrs. Love prior to the time she was taken to the hospital and after her return, and also called upon her when she was ill in the hospital.

Loretta Lawrence, a colored person, testified at length for appellant. She stated how long she had known and how frequently she visited with Mrs. Love; that she had gone to St. Louis with her for the burial of the body of her husband; that she had charge of Mrs. Love's bank book for a time while she was sick and had deposited money in the bank for her; that one time she deposited in her own name some of the money belonging to Mrs. Love. She said that Mrs. Lapeere raised some question about the manner in which witness had handled some of Mrs. Love's money; that Mrs. Love told witness that Long and Mr. and Mrs. Lapeere had told her that witness had been crooked with Mrs. Love's money. She also testified that while the testatrix was in the hospital she told witness that Long and the Lapeeres were "ding-donging her" to make a will and told her the State would get all she had if she did not make a will, and they made her sign one; that after Mrs. Love returned home she heard Long on two occasions ask her when she could go to attorney Long's office to have a new will made; that she had to make a new one because the one made in the hospital was no good; that when she told him she could not climb the steps to the attorney's office, Long said he would have attorney Long come over, and Mrs. Love told him, "Don't send him." Witness also heard Mrs. Love say, "I don't want no will," and, "I do not believe in wills." Witness said Mrs. Lapeere quarreled with Mrs. Love at Christmas time, 1926, because witness sent a Christmas dinner to Mrs. Love. Mrs. Lawrence told about Mrs. Love having a letter from her nephew, James Miles,

and about writing to appellant at Indianapolis to come and see her; that Mrs. Love said, "When Carrie comes I want to have the will changed; I want Carrie to have what I have;" that after Carrie came in August, 1927, and stayed two days with Mrs. Love, the latter told witness that Carrie would be back Christmas and was going to stay, and "the will will be changed as soon as Carrie comes back to East Moline." After appellant left, her aunt told witness, "I didn't get the will changed while Carrie was here; it is not my will; I was forced to make a will; it is not my will because I never wanted a will."

Pherson Lawrence, the husband of Loretta Lawrence, testified Mrs. Love told him that Charles Long forced her to make a will; that he told her it was no good and that she had to make another; that she said it was Long's and Lapeere's will, and said, "I do not want no will." He also stated that he heard Charles Long say to Mrs. Love that he was the cause of her husband holding his job and that he (Long) was entitled to the "comeback."

Mrs. Beale, a white woman who lived next door to Mrs. Love for seven years, said Mrs. Lapeere never came to see Mrs. Love after Christmas, 1926. Witness said appellant came to see Mrs. Love about two weeks before she died, and Mrs. Love wanted her to stay so that she could have things fixed up to go to her, but the niece said, "No, she would wait until Christmas time and she would be back." When Mrs. Love took sick, about two weeks later, she asked witness to send a telegram to Carrie, her niece, which she did, but Carrie did not arrive till after Mrs. Love had died.

The foregoing is the substance of all the material evidence offered on the question of undue influence. Some of the testimony tending to show that the testatrix was in favor of making other disposition of her property than that which she actually made in her will would no doubt have been denied admission, or at least stricken from the record, had objection or motion to that effect been made. The gen-

eral rule is that statements made by a testator, either before or after the execution of a contested will, which are in conflict with the provisions thereof, do not invalidate or modify such will in any manner, and that parties making wills can not invalidate them by their own parol declarations made previously or subsequently. (*Waters* v. *Waters,* 222 Ill. 26; *Taylor* v. *Pegram,* 151 id. 106.) The two main witnesses for the appellant were Loretta Lawrence and her husband. The testimony of Mrs. Lawrence is not entirely consistent in so far as it tends to show whether or not Mrs. Love wanted a will, and she admits that she had anything but a friendly feeling toward Mrs. Lapeere and Charles Long, who had accused her of being crooked with Mrs. Love's money. None of the persons charged with undue influence were present or had anything to do with the making, execution or attestation of Mrs. Love's last will and testament in June, 1926. There was no proof that any particular person or organization was to be favored by the terms of the will. Charles Long was merely named as one of the executors, and the bequest of $100 to Mrs. Lapeere was fully explained by the testatrix to her attorney when she talked to him about her will. It was not at all unusual or unnatural for testatrix to leave the bulk of her property to her foster child and the latter's daughter, to give a sum to each of the colored churches in which she was interested in East Moline, and to provide for the upkeep of her cemetery lot in St. Louis where she desired her body to be placed and where, doubtless, her husband had been previously buried. At the time she made her will in June, 1926, she had no knowledge of the whereabouts of any of her relatives except Harry Lewis, who was named in the will. The Longs and the Lapeeres may have urged Mrs. Love to make a will, but there is no proof that either of them influenced her to make any of the devises or bequests mentioned in her will or to neglect to make other provisions. If she desired to change her will at a later date or to destroy it entirely she

was privileged to do so. The undue influence which will avoid a will must be directly connected with the execution of the instrument and operate at the time it is made. The influence must be specially directed toward procuring the will in favor of a particular party or parties, and it must be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of another or others than of his own. (*Woodman* v. *Illinois Trust and Savings Bank,* 211 Ill. 578; *Applehans* v. *Jurgenson, supra.*) In our judgment there was no competent evidence fairly tending to prove the charge of undue influence, and the jury could not reasonably have found in favor of appellant upon that issue.

The court properly directed a verdict in this case finding in favor of the appellees, and the decree will therefore be affirmed.

*Decree affirmed.*