(No. 29794.—

SAM M. CHALLINER, Appellee, *v.* MABEL SMITH, Appellant.

*Opinion filed January 22, 1947.*

Kenneth H. Lemmer, and Richard W. Velde, both of Havana, for appellant.

Henry E. Pond, of Petersburg, and Edward J. Flynn, and Carl E. Robinson, both of Jacksonville, for appellee.

Mr. Chief Justice Gunn delivered the opinion of the court:

Elizabeth Couchman died March 5, 1944. She executed her last will and testament on December 15, 1943. The will was probated in the county court of Menard county. The principal beneficiary and executrix of the will was Mabel Smith, a niece of the deceased. On January 13, 1942, she had made and executed a will in which she made the plaintiff, Sam M. Challiner, the principal legatee and executor. He was not one of the heirs-at-law of the deceased. Challiner offered the will of January 13, 1942, for probate, but it was refused because of the later will, which revoked it as a matter of law. The suit was brought by the plaintiff on December 29, 1944, to contest the last will upon the grounds of undue influence exercised by appellant, Mabel Smith, and because the testatrix did not have capacity to make a will, because she was of such unsound mind and memory as to lack the ability to make a will. The beneficiary in the first will has a contestable interest under the statute. *Adams* v. *First M. E. Church,* 251 Ill. 268.

The case was tried before a jury and resulted in a verdict finding the will of December 15, 1943, was not the last will and testament of Elizabeth Couchman. Two special interrogatories were offered and by one the jury found that Elizabeth Couchman was, at the time of the execution of the last will, of unsound mind and memory, and also found in answer to the other special interrogatory that Elizabeth Couchman was unduly and wrongfully influenced by the defendant, Mabel Smith, to make said will of December 15, 1943.

At the close of the plaintiff's evidence and of all of the evidence the defendant made separate motions for the court to exclude all of the evidence offered on the issue of undue influence, and of lack of mental capacity, and in each instance the motion was denied by the court. The court overruled a motion for a new trial and for judgment notwithstanding the verdict, and entered a decree setting aside such will. A freehold is involved, and hence the appeal comes directly to this court.

For a proper determination of the case it is necessary to discuss separately the evidence offered on the question of undue influence and of lack of mental capacity. The law is well settled that the undue influence which will invalidate a will must be directly connected with the instrument, must be operative when the will is made, must be directed towards the procuring of the will in favor of certain parties, and must destroy the freedom of the testator's action. The rule is set forth specifically in *Applehans* v. *Jurgenson,* 336 Ill. 427: "The undue influence which will avoid a will must be directly connected with the execution of the instrument and operate at the time it is made. The influence must be specially directed toward procuring the will in favor of a particular party or parties, and it must be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of another or others than his own." This rule has been followed and adhered to in *Morecraft* v. *Felgenhauer,* 346 Ill. 415; *Quathamer* v. *Schoon,* 370 Ill. 606; *Johnson* v. *Lane,* 369 Ill. 135, and *Frese* v. *Meyer,* 392 Ill. 59, and hence may be said to be firmly established.

The evidence in the case falls far short of complying with what is necessary to establish undue influence. The deceased had suffered a broken leg in the previous year and had been confined to Passavant Hospital in Jacksonville, with her leg in a cast for several weeks. In October, 1943, deceased was threatened with pneumonia, and she

was taken to Our Saviour's Hospital in Jacksonville. She was a woman about seventy-three years of age, and was suffering from failing strength due to old age and a cancer of the breast, which ultimately resulted in her death in March, 1944. Appellant, as well as appellee, visited Mrs. Couchman in the hospital. A few days before December 15, 1943, appellant called at the home of the attorney for deceased, and stated that testatrix wanted him to come to the hospital to write her will. Appellant accompanied the attorney to the hospital. She did not go into the room where the will was written. There is no evidence whatsoever to substantiate the charge in the complaint that plaintiff induced the attorney to have a will in her behalf made by the testatrix, or that she persuaded, or in any other way caused the deceased testatrix to sign and make the will, or that she induced anyone to sign their names as witnesses thereto. On the last proposition, the attorney volunteered to sign as a witness, and, when some of the nurses were requested to act and declined because of the rules of the hospital which did not permit them to act as witnesses, the nurse supervisor called attention to the fact that there was another man in the waiting room, visiting a relative, and, when asked by the supervising nurse, he came and acted as a witness to the will. Proof of this character is not sufficient under the rule announced above.

The appellee calls attention to authorities which he says raise a presumption that influence was used because of appellant's relationship to the deceased, and her being a principal beneficiary. In *England* v. *Fawbush*, 204 Ill. 384, the beneficiary was a son who prepared the will himself, took the same to his father, who was old and sick in bed, and stood by while his father signed it. In *Tidholm* v. *Tidholm*, 391 Ill. 19, it was admitted there was a fiduciary relationship between the beneficiary and the testator. In that case the court entered a judgment notwithstanding the verdict on the motion of the beneficiary because, while

the proof showed she was present while the testator talked with the attorney, and when he signed the will, there was no proof indicating she influenced the testator. In both *Sulzberger* v. *Sulzberger,* 372 Ill. 240, and *Friberg* v. *Zeutschel,* 379 Ill. 480, the beneficiary was present and was a principal beneficiary, and did occupy fiduciary or confidential relationships which invoked the presumption claimed to exist here.

It will be observed that what was done in these cases were things which come within the rule of undue influence, as expressed above, and was of a character that would procure a will in favor of such influence instead of a will of the testator. However, such authorities to be applicable must be supported by proof. There is no proof whatsoever of a fiduciary relationship; in fact, the evidence of the plaintiff is the other way, for some of the witnesses testified that the deceased complained because Mrs. Smith and her husband had not spoken to her for some time. She was not present when the will was prepared, and neither did she tell the attorney what to put in the will; nor is there any evidence she used any persuasion in procuring the making of the will. The trial court should have, at the close of the plaintiff's case, excluded all of the evidence on the issue of undue influence.

However, in addition to there being no evidence to substantiate the charge of undue influence, the court gave several instructions upon this question, and also gave a special interrogatory for the jury to answer. All of this could have no other effect than to cause the jury to believe there was sufficient before it to pass upon the question of undue influence, when as a matter of law it should not have been submitted. We have held in a number of cases that submitting an issue of undue influence to a jury, where it was not sufficient to set aside a will, together with an issue of lack of testamentary capacity, would not cause reversal. (*Bundy* v. *West,* 297 Ill. 238; *Aftalion* v.

*Stauffer,* 284 Ill. 54.) In these cases there was either no motion made to exclude the evidence on undue influence, or there was some evidence which, alone, was insufficient. This is not parallel with a case where there is no evidence to substantiate the charge in the complaint. In such a case it devolves upon the court to determine whether it could have any influence upon the result, especially where the case is very close upon the evidence. In *Buerger* v. *Buerger,* 317 Ill. 401, we said: "It is argued that where both mental incompetency and undue influence are charged, a decree will not be reversed for an erroneous refusal to take from the jury one of the issues which there is no evidence to sustain if there is evidence to support the other charge. (*Holland* v. *People's Bank,* 303 Ill. 381.) This rule has its foundation in the general rule that a judgment will not be reversed for error which could not have misled the jury and could not reasonably have affected the verdict. Where the evidence to support the issue properly submitted to the jury is in itself of an inconclusive character and the evidence on the other issue is of a character to appeal to the prejudice, passion or sympathy of the jury, it is error to submit the latter issue, and the evidence in support of it, to the jury."

This will require us to analyze the evidence. The plaintiff's witnesses consisted principally of relatives of the deceased and her tenants. Mr. and Mrs. Rittenbush were tenants on her farm and had known her for a number of years. The substance of Mrs. Rittenbush's testimony is that when they came to the hospital she got the husband's first name wrong; that she was in poor physical condition, and was getting weaker; that she wanted the husband to go and ask the attorney what papers she had signed; and that the testatrix said Mrs. Smith was present when she signed. From these facts, coupled with her knowledge of her prior to that time, she was of the opinion Mrs. Couchman was of unsound mind. On cross-examination she said

she talked over with testatrix the business of the farm; that testatrix knew where they were farming, and endorsed farm checks. The husband's testimony is about the same as that of the wife; that testatrix called him by the wrong first name; that he took her the checks, which she endorsed, for the rent, and talked to her about her income tax.

Mrs. Hemmack was a cousin and had known testatrix all of her life; she visited her in the hospital with her husband. She said the deceased did not know her husband and addressed him by his wrong given name; that she talked about the property she had given Mabel Smith; also talked about Challiner, and particularly pointed out that she wanted to go to Jacksonville to get a hat like that of the witness. She also said Mrs. Couchman was hard of hearing, and was getting weaker, and from these facts concluded she was of unsound mind and memory. On cross-examination she said she thought Mrs. Couchman was of unsound mind because she did not sit up in bed and was deaf in one ear; that she based it also upon the talk about the hat, although she did concede Mrs. Couchman meant she would get the hat after she got well, and finally concluded she never had talked to her when she thought she was of unsound mind.

Roy Watts was a cousin and also a banker. He had handled some business for testatrix previous to her last illness. He said when he visited her she did not talk much, and they did not carry on much conversation, and that she called him "Louie" instead of his correct given name, and talked about her limb being in a trough, which other evidence shows was a fact, when she had her leg broken. From these facts, and her aversion to converse with him, compared with his prior knowledge of her, he concludes she was of unsound mind. On cross-examination he said it was a conversation she had with him in the bank prior to going to the hospital which caused him to think she was not of sound mind, and was very weak.

Warren Watts was another cousin, and knew her well. He saw her in December, while she was in the hospital. She recognized him, and while formerly she called him by his first name, on this visit she said she did not know him, and for him to go out of the room. Over objection he said there was a difference in her condition from the time he saw her in 1942 and after that. On cross-examination he said he did not deduce from the things that happened in the hospital that she was of unsound mind and memory. "She acted queer, never seemed to know what we were talking about, didn't answer, and told us to get out," and from that he concluded she was of unsound mind. He further stated he never had had any business transactions with her, or any conversation upon which to base an opinion, but just thought she was not right.

Mrs. Leiter was also distantly related to testatrix. She visited at her house before she went to the hospital. She testified that testatrix said the defendant would not speak to her; she later saw testatrix at the hospital; she was there when Challiner was there, when the testatrix told the latter to get a battery out of her car, and to take care of it, and handed him the automobile keys. When she went back later Mrs. Couchman thought she was living in a hotel; she did not know an old neighbor on one occasion when she was present. She testified that from her conversation and former acquaintance she thought she was of unsound mind.

Mrs. Eddings was another relative, and had known testatrix all of her life; she saw her in December in the hospital. She testified they talked about the crops on the farm; that testatrix said she kept everything on the farm locked on account of her neighbors, Mabel Smith and her husband. Later she would ask who she was; she tried to get her to talk, but she was too weak; she talked about it raining when the sun was shining. She had an opinion that in December, 1943, Mrs. Couchman was of unsound

mind. On cross-examination she said testatrix was hard of hearing, and had few visitors, and based her opinion of her being of unsound mind upon the fact that she would not talk with her.

Mrs. Biggs was an old friend and a visitor in the hospital, and several times the testatrix talked with her about her farming interests. She testified she said to the testatrix "I don't think you understand who I am," and that her reply was "Oh, yes, yes, I know who you are," and that testatrix then wandered off to talk of something else. This witness did not give any opinion on the mental ability of the testatrix.

The testimony of Carl E. Leiter relates to September, 1943, when testatrix talked about her farm, her stock, and her car, and about having a fender bent, and about wanting Mr. Challiner to look after it, and making the comment that the Smiths did not speak to her. There was no opinion from this witness.

The witnesses Justine Decker, Norma Christison and Mrs. Mary Bennett were nurses in Our Saviour's Hospital. Their testimony shows that some of them were in the room of the testatrix every day; that they observed she gradually grew weaker and was not as clear mentally as at first; that they did not attempt to carry on extended conversations; and that sometimes her talk would not make sense. Mrs. Bennett also testified Mrs. Smith asked her to become a witness to a will, but she declined because it was against the policy of the hospital for nurses to act as witnesses. None of these nurses were asked or gave any opinion as to the mental capacity of the testatrix. The testimony of the other nurses is quite similar, except they were not there continuously as was Mrs. Bennett.

There was other testimony of the plaintiff relating to the signing of checks. The bank cashier identified checks bearing date of December 17, December 24, December 31, and January 14, payable to the hospital, signed by the

testatrix. There were also five or six checks offered by the defendant, during the same period, all signed by the testatrix. There was also offered one check signed by the testatrix by her attorney to pay income tax, but in January, February and March, all subsequent to the making of the will, checks on her account were executed in her name, through Mabel Smith, as agent.

The testatrix eventually died as the result of cancer of the breast. She was deaf and heard with difficulty; she lay down in bed all of the time she was in the hospital, and there is no evidence as to whether she did or did not wear glasses. There is no testimony as to whether she knew the names of her relatives, or her natural heirs, or whether she had any knowledge of the extent of her property. There is a strong inference she did know the extent of her property from the evidence of settlements with her tenants, the correctness of which is not questioned. The fact that she did not talk at times can be attributed to disinclination, or deafness, as well as to inability, so far as the evidence discloses.

On behalf of the defendant the evidence was much more positive. The family physician knew the testatrix for many years; he visited her frequently, calling on her professionally fourteen or fifteen times between October 15 and March 4. He described her general condition, stating it was about the average of those suffering from cancer; that she knew the doctor, and talked with him about affairs, and that he saw no evidence to show she was not of sound mind and memory; that from the middle of January there was a gradual, progressive change until she died.

Carrie Watt said she visited testatrix frequently; she never noticed any difference in her physical condition until the last, only she was weaker, but plaintiff, Challiner, was there nearly every time she was.

Probably the most effective witness in the case was Mr. Janssen, the minister, who was a faithful caller from

October until testatrix's death. He testified he called upon her once in October, twice in November, three times in December, four times in January, seven times in February and once in March; that he talked with her on all of these occasions; that she asked how the church was getting along, and how his wife was; that she always recognized him; that there were other visitors there, some of whom were plaintiff's witnesses; that he never noticed any difference in her condition, and he was of the opinion she was of sound mind.

Pauline Power was a nurse's helper and was there continuously, but did not give an opinion. William McCullough was one of the witnesses to the will; one of his relatives was a patient in the hospital. He was requested by one of the nurses to become a witness to the will. It was the only time he had met the deceased, but he was strongly of the opinion she knew what she was doing, and that she was of sound mind.

Steve Henley visited testatrix about every two weeks; he had worked for her around the house for years; she inquired about all of the relatives and friends she had in the town; he would stay about thirty minutes; he was there when Mrs. Rittenbush said they were there to settle up, and presented certain checks and papers, which were approved by Mrs. Couchman.

Edward H. Golden was the family attorney, who prepared the will. He had settled the estate of the husband of the testatrix 22 years before that time. The testatrix called him by name when he entered the room, and talked about other things for a few moments. She said she thought she would stay in the hospital until it got warmer. He inquired if she had sent for him to make her will, and she answered in the affirmative, and then told him she wanted to give the property to her niece, Mrs. Smith. Mrs. Smith was not in the room at the time the will was prepared; it was read to Mrs. Couchman, and she said

"Give me my glasses." She put them on, read the will and said "That is all right; that is the way I want it." He volunteered he could act as one of the witnesses, but they would have to have another. When the nurse came in he told her to get the head nurse, and she went back, and after a while she returned and said she was not in. There was a man in the waiting room, and he was then called and acted as a witness. Other business was discussed with Mrs. Couchman at the time, about income taxes, and about one of her friends having died, who had been buried in Petersburg instead of her home town. She offered to pay for preparation of the will at the time, and she was told to let it go until some other time. She directed him to see Challiner, who had the keys to her car and residence, and said that she wanted them. He could not see any difference in her appearance. He was of the opinion she was of sound mind and memory.

In addition to the foregoing facts it is established without dispute that she received checks from her tenants; settled for the corn, oats and wheat; paid the hospital bills; was of the opinion she was being overcharged because she was required to pay in advance, and there were a number of other instances which showed she actually did transact business intelligently, although one of the witnesses volunteered that she did not have the capacity to transact ordinary business.

As pointed out above, there is no testimony on either side as to her lack of knowledge of her relatives, or persons who could expect to benefit from her bounty, or any want of knowledge as to the extent of her property, or her capacity to understand what was meant by the execution of a will. It can be thus seen that the evidence was very close. If the testimony of the plaintiff's witnesses were weighed strictly according to the rules it would be very doubtful if it was sufficient to uphold a verdict. Under these circumstances, it is not only necessary that

the jury be properly instructed but that no other error intervene which had a tendency or was liable to confuse the issues, where the evidence was as close as it appears to be in this case.

There were fifteen instructions given on behalf of the plaintiff, and twenty-eight on behalf of the defendant. The giving of this number of instructions alone would have a tendency to confuse the jury, even if they had discussed separate propositions. This they did not do. They lapped and overlapped to an extent that it is difficult for a person learned in such things, to say nothing of a jury, to ascertain what rules of law the jury should follow in interpreting the evidence.

Instruction No. 11, on behalf of the plaintiff, was as follows: "The Court instructs the jury that if the jury find from a preponderance of the evidence that at any time before the execution of the will in question the testator was of unsound mind and memory and that such unsoundness of mind was of a permanent nature, the law presumes in the absence of proof of the contrary that such unsoundness of mind continued." There is no accord in the evidence that there was a particular time before the execution of the will when the testator was of unsound mind or memory. It is probable this instruction was offered because the previous year she had been in the hospital with a broken leg, although facts upon which it was offered are not disclosed. There is no evidence of anyone, aside from the opinions pointed out above, tending to show she was of unsound mind. This instruction is predicated upon supposed evidence that at some time she had actually been of unsound mind, and then proceeds to tell the jury the presumption is that she so remained.

The answer of appellee is that the instruction referred to unsoundness of mind of a permanent nature, and therefore was harmless. There is nothing in the proof that shows that at any time prior she had suffered from any

physical or mental ailment which rendered her permanently of unsound mind. This type of instruction has been severely criticized. *Trish* v. *Newell,* 62 Ill. 196, involved a will where the maker, previous to the making of the same, had become unconscious by reason of a stroke of paralysis. Some four months after, he made his will, and, in the will contest following, an instruction involving the principle embodied in instruction No. 11 was given. The court held that it was no more a presumption of law that a person rendered unconscious and incapable of mental action by a stroke of paralysis will continue so for four months thereafter, than that he would if the same effect were produced by a wound; that such a result may follow in either case, but the law will not so presume; and after so commenting said: "The instruction we have just been considering is so essentially erroneous, that, for giving it, we must reverse the decree. But we feel constrained to condemn others given on behalf of complainants, *viz.,*" etc. If such an instruction was not proper in a case where a testator had been totally unconscious from paralysis four months before the making of the will, how could it be proper in a case where there is no proof of unconsciousness, or any satisfactory proof of an occasion where she had been totally bereft of necessary testamentary understanding? The *Trish case* was approved in *Rutherford* v. *Morris,* 77 Ill. 397, and in *Taylor* v. *Pegram,* 151 Ill. 106.

We are constrained, as we were in *Trish* v. *Newell,* to examine some of the other instructions given on behalf of the plaintiff. In instruction No. 5 the jury was told that to be of sound mind and memory a person making a will must be capable of knowing the property she was to dispose of, who were the natural objects of her bounty, and the effect of the act of executing her will, and it then added: "and if you believe from a preponderance of the evidence, that at the time of the execution of the alleged will, the said Elizabeth Couchman did not understand the

nature or consequence of the execution of said alleged will, then in that case you will find against the validity of the alleged will." This statement is not one of the requirements of testamentary capacity.

In *Yoe* v. *McCord,* 74 Ill. 33, the following instruction was given: "The jury are instructed that the mere fact of the signing and acknowledgment of the alleged will by the said John McCord does not entitle it to be treated or considered as his will, and that in addition thereto it must appear to the jury, from the evidence, that it is his actual deed, and if they should find, from the evidence, that he did not know each and all of its provisions, then it is not his will." The court said: "The instruction was further wrong in saying that if the testator 'did not know each and all of its provisions' then the instrument was not his will. Most written instruments probably would fail to stand the test of any such rule. Writings are constantly passing from one to another in the every day transactions of business, where the makers are more or less ignorant of their entire contents, executed often without reading or hearing them read, in trust upon some other person for their being correct, where there may be, in fact, no actual knowledge of what they do contain. A written instrument is not to be defeated by evidence that the maker did not know each and all of its provisions. The idea is inadmissible. Where the testator is shown to have executed an instrument as his will, being in his right mind, and there is nothing of fraud or imposition, it will be presumed that he was aware of its contents."

In *Dowdey* v. *Palmer,* 287 Ill. 42, an instruction for the contestant contained, among other things, the statement that the testator "must have had at the time a full comprehension of the surrounding circumstances and of their direct consequences and probable results," in order to have testamentary capacity. This has the same meaning, if not the identical words, as the instruction under consideration in

this case. In holding this instruction bad we said, after reviewing earlier authorities: "Beyond question, instruction 10, because of its misleading character in this regard, should not have been given. No man, even though in full possession of testamentary capacity, can with certainty know that he has full comprehension of the direct consequences and the probable results of his will. He may think he knows, but experience shows that the most far-sighted minds are often mistaken as to what they think will be the probable results of actions that they are taking." A like instruction was held bad in *Turnbull* v. *Butterfield*, 304 Ill. 454.

Plaintiff's instruction No. 6 was given on the question of undue influence, and it told the jury that if it believed a relation of trust and confidence existed between the testatrix and Mabel Smith, and that the latter procured the preparation of the will, and was present immediately before and after its execution, that such are circumstances to be considered in determining whether or not the testatrix was unduly influenced by Mabel Smith in the preparation of the last will and testament. The vice in this instruction lies in the fact that there was no evidence of a relation of trust and confidence between testatrix and Mabel Smith or of procuring the preparation of the will, and no other evidence bringing Mrs. Smith within the law as to what constitutes undue influence, as pointed out above. There must be some evidence to show that Mrs. Smith had a direct influence in procuring the will, of such a character as to destroy the freedom of the testator's will and render it the offspring of the will of another.

Likewise, there was no evidence to justify plaintiff's instruction No. 7, which propounded the following inquiry: "Did the deceased, Elizabeth Couchman, make and execute the alleged will, in all its provisions, of her own free will and volition, so that it now expresses her own wishes and intentions, or was she constrained or induced, through the

undue influence or improper conduct of the said Mabel Smith, to act contrary to her own desires and intentions as regards the disposition of her property." Evidence of such facts as expressed in this instruction was lacking, and both it and instruction No. 6 were improper, especially in view of the extreme closeness of the evidence upon testamentary capacity. (*Buerger* v. *Buerger,* 317 Ill. 401.) Likewise, the giving of the special interrogatory as to undue influence, together with the last two instructions, would give the jury the impression that such matters could be considered in connection with the evidence of the mental capacity of the testator.

The giving of these instructions upon undue influence, without the evidence to support it, could not help but have, in view of the closeness of the evidence, an effect upon the jury, and the fact that the jury did find undue influence without sufficient evidence to justify it indicates that it was either confused by the instructions of the court, or else did not understand from the instruction of the court what did constitute undue influence, and if it did so misunderstand the instructions in this regard, it could easily have misinterpreted the ones upon mental capacity.

Reverting to the evidence upon mental capacity, the objection is made that the facts disclosed were insufficient to permit an opinion upon the part of many of the witnesses. The one fact which stands out is that the testatrix was to a certain extent forgetful. It is also shown she was partially deaf, and also in feeble health. At times she would not talk, but at others discoursed freely upon matters in which she was interested. Also, the evidence on both sides shows she settled for her rent, and received the same in checks, which she endorsed, sent to the bank and had deposited; that she paid her hospital bills; and that she was worried about her income tax, which she later paid through her attorney.

The testimony of the witness who based her opinion as to the unsoundness of mind upon the fact that Mrs. Couchman would not sit up in bed and was deaf, should have been excluded, but no motion was made for such purpose. The opinion of another witness, which was not based upon any conversation or transaction but just because she thought the testatrix was of unsound mind, should likewise have been excluded, if a motion had been made for such purpose; and the opinion of the third witness, based upon the fact that Mrs. Couchman would not talk to her, should, upon proper motion, have been excluded.

The testimony became negative, because based upon an improper foundation. These circumstances indicate insufficient foundation was laid for opinion. evidence, and, while it was submitted to the jury, yet its weight was very questionable when taken as a whole. Neither old age, nor feeble health, nor both, although combined with defective memory, will constitute lack of testamentary capacity. (*Lewis* v. *Deamude,* 376 Ill. 219; *Miles* v. *Long,* 342 Ill. 589; *Forberg* v. *Maurer,* 336 Ill. 192.) And it is recognized that a person may be of unsound mind and memory to some extent, but still be capable of making a will, (*Grosh* v. *Acom,* 325 Ill. 474;) and that to have sufficient capacity to make a will the testator is only required to have capacity to know who are the natural objects of his bounty and to be able to remember them, and it is not necessary that he actually know them. *Down* v. *Comstock,* 318 Ill. 445.

In view of the error of the court in refusing to take from the jury the issue of undue influence, the improper instructions given, as pointed out above, and the wholly unsatisfactory nature of the evidence upon mental capacity, we think a new trial should be granted by the trial court.

The appellant also urges that she was not allowed to testify in rebuttal. There were certain statements attributed to her to which she was entitled to reply, but counsel did

not offer her as a witness for this purpose, which is permissible under an exception, (Ill. Rev. Stat. 1945, chap. 51, par. 2,) but offered her as a general witness, which was objectionable under the same statute.

The decree of the circuit court of Menard county is, accordingly, reversed, and the cause is remanded to that court for a new trial, with instructions to proceed in a manner consistent with the views herein expressed.

*Reversed and remanded.*